T.C. Memo. 2003-150


UNITED STATES TAX COURT


RIVER CITY RANCHES #1 LTD., LEON SHEPARD,
TAX MATTERS PARTNER,
RIVER CITY RANCHES #2 LTD., LEON SHEPARD,
TAX MATTERS PARTNER,
RIVER CITY RANCHES #3 LTD., LEON SHEPARD,
TAX MATTERS PARTNER,
RIVER CITY RANCHES #4 LTD., LEON SHEPARD,
TAX MATTERS PARTNER,
RIVER CITY RANCHES #5 LTD., LEON SHEPARD,
TAX MATTERS PARTNER,
RIVER CITY RANCHES #6 LTD., LEON SHEPARD,
TAX MATTERS PARTNER,
ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos.   787-91,   4876-94,      Filed May 23, 2003.
              9550-94,   9552-94,
              9554-94,  13595-94,
             13597-94,  13599-94,
              382-95,    383-95,

_____

[1] The Appendix sets forth, for each of these consolidated cases, the docket number, partnership, and tax matters partner. By orders issued from June 22, 2000, through May 15, 2001, the Court removed Walter J. Hoyt III (Jay Hoyt), as tax matters partner in each of the consolidated cases. In those orders, the Court appointed a successor tax matters partner in each case.

385-95,     386-95,
14718-95,  14719-95,
14720-95,  14722-95,
14724-95,  21461-95,
 5196-96,   5197-96,
 5198-96,   5238-96,
 5239-96,   5240-96,
 5241-96,   9779-96,
 9780-96,   9781-96,
14038-96,  21774-96,
 3304-97,   3305-97,
 3306-97,   3311-97,
 3749-97,  15747-98,
15748-98,  15749-98,
15750-98,  15751-98,
15752-98,  15753-98,
15754-98,  19106-98,
13250-99,  13251-99,
13256-99,  13257-99,
13258-99,  13259-99,
13260-99,  13261-99,
13262-99,  16557-99,
16563-99,  16568-99,
16570-99,  16572-99,
16574-99,  16578-99,
16581-99,  17125-99.

Montgomery W. Cobb, for petitioners.

Terri Ann Merriam and Wendy S. Pearson, for participating partners in docket Nos. 9554-94, 13599-94, 383-95, and 16578-99.

Thomas A. Dombrowski, Catherine A. Caballero, Alan E. Staines, Thomas N. Tomashek, Dean H. Wakayama, and Nhi Luu, for respondent.

## Contents

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . 7

A.   Overview of the Hoyt Operations . . . . . . . . . . . . . 7

B.   Formation and Operation of the Hoyt Sheep Partnerships . . 9

C.   Respondent's Examination Efforts and Enforcement Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

D.   Governmental Investigations of Jay Hoyt . . . . . . . . 25

E.   Certain Agreements Extending the Period of Limitations That Jay Hoyt and the IRS Executed . . . . . . . . . . . . . . 30

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Issue 1.   Entitlement to Partnership Level Theft Loss Deductions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

A.   The Parties' Arguments . . . . . . . . . . . . . . . . . 32
     1.   Petitioners' Arguments . . . . . . . . . . . . . . 32
     2.   Respondent's Arguments . . . . . . . . . . . . . . 34

B.   Discussion of Applicable Law . . . . . . . . . . . . . 35
     1.   Section 165 Theft Loss . . . . . . . . . . . . . . 35
     2.   Estoppel Principles . . . . . . . . . . . . . . . 37
          a.   Equitable Estoppel . . . . . . . . . . . . . 37
          b.   Collateral Estoppel . . . . . . . . . . . . 39
          c.   Judicial Estoppel . . . . . . . . . . . . . 41

C.   Discussion of Partnership Level Theft Loss Deductions . 43
     1.   Determination of Whether the Sheep Partnerships Were Victims of Theft . . . . . . . . . . . . . . . . . . 43
          a.   The Occurrence of a Theft . . . . . . . . 43
               (i)    Jay Hoyt's Conviction of Federal Crimes . . . . . . . . . . . . . . . . . . 45
               (ii)   Petitioners' Claim That a Theft From the Partners is a Theft From the Partnerships . . . . . . . . . . . 51
               (iii)  Petitioners' Claim That a Theft Occurred Under State Law . . . . . . . . . 55
               (iv)   Analysis of Case Law Cited by Petitioners . . . . . . . . . . . 61
          b.   The Year of Discovery Requirement . . . . . 65
               (i)    Application of Equitable Estoppel . 67
               (ii)   Application of the Rod Warren Ink Case . . . . . . . . . . . . . . . . . . 72
               (iii)  Petitioners' Year of Discovery Claim . . . . . . . . . . . . . . . . . . 76
          c.   The Remaining Elements of a Theft Loss . . . 76
     2.   Application of Collateral and Judicial Estoppel . . 77
          a.   Collateral Estoppel . . . . . . . . . . . 77
          b.   Judicial Estoppel . . . . . . . . . . . . 80

D.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . .  82

Issue 2.   Expiration of the Period of Limitations . . . . . .  82

A.    The Parties' Arguments . . . . . . . . . . . . . . . . .  82
      1.   Petitioners' Arguments  . . . . . . . . . . . . . .  82
      2.   Respondent's Arguments  . . . . . . . . . . . . . .  85

B.    Discussion of Applicable Law . . . . . . . . . . . . . .  87

C.    Determination as to Whether the Applicable Periods of
      Limitations on Assessment Have Expired . . . . . . . .  91

D.    Conclusion . . . . . . . . . . . . . . . . . . . . . .  101

Issue 3. Whether Some Partnerships' Purported Purchases of
      Breeding Sheep Constitute Either Valuation Overstatements
      for Purposes of Section 6621(c)(3)(A)(i) or Sham and
      Fraudulent Transactions for Purposes of Section
      6621(c)(3)(A)(v) . . . . . . . . . . . . . . . . . . .  101

A.    The Parties' Arguments . . . . . . . . . . . . . . . .  101
      1.   Petitioners' Arguments  . . . . . . . . . . . . .  101
      2.   Respondent's Arguments  . . . . . . . . . . . . .  104

B.    Section 6621(c)  . . . . . . . . . . . . . . . . . . .  106

C.    The Tax Court's Jurisdiction . . . . . . . . . . . . .  107

APPENDIX  . . . . . . . . . . . . . . . . . . . . . . . . . .  110

MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, Judge:  These consolidated cases were assigned to Special Trial Judge Stanley J. Goldberg, pursuant to Rules 180, 181, and 183.  All Rule references are to the Tax Court Rules of Practice and Procedure.  Section references are to the Internal Revenue Code in effect for the years at issue.  The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

## OPINION OF THE SPECIAL TRIAL JUDGE

GOLDBERG, Special Trial Judge:  Respondent issued a notice of final partnership administrative adjustment (FPAA) to each partnership involved in these consolidated cases determining adjustments for the taxable years at issue.[2]  From 1981 through 1998, Walter J. Hoyt III (Jay Hoyt) promoted these nine sheep breeding partnerships to numerous investors and managed partnership operations.  For convenience, these partnerships are hereinafter sometimes referred to as the Hoyt sheep partnerships and these consolidated cases are referred to in the singular (i.e., instant case).  In addition, the individual partners in the sheep partnerships are collectively referred to as sheep partners.

On June 22, 1999, the Court issued its opinion in River City

---

[2]  The years at issue for River City Ranches #1 are 1986 and its years ended Sept. 30, 1991 through 1996.  The years at issue for River City Ranches #2 are 1986 and 1987, its year ended Sept. 30, 1991, and its years ended Sept. 30, 1993 through 1996.  The years at issue for River City Ranches #3 are 1986 and 1987, its years ended Sept. 30, 1989 through 1991, and its years ended Sept. 30, 1993 through 1996.  The years at issue for River City Ranches #4 are 1984 and 1986, and its years ended Sept. 30, 1992 through 1996.  The years at issue for River City Ranches #5 are 1986, 1987 and 1988, and its years ended Sept. 30, 1989 through 1996.  The years at issue for River City Ranches #6 are 1986 and its years ended Sept. 30, 1992 through 1996.  The years at issue for River City Ranches 1985-2/River City Ranches #7 are 1987 and 1988, and its years ended Sept. 30, 1989 through 1996.  (In 1991, River City Ranches 1985-2 became known as River City Ranches #7.)  The years at issue for Ovine Genetic Technology Syndicate 1987-1 are its years ended Sept. 30, 1990 through 1996.  The years at issue for Ovine Genetic Technology 1990 (OGT 90) are 1992, 1993, 1994, 1995, and 1996.

Ranches #4, J.V. v. Commissioner, T.C. Memo. 1999-209, affd. 23 Fed. Appx. 744 (9th Cir. 2001), a test case in which the Tax Court upheld respondent's disallowance of all deductions that three Hoyt sheep partnerships claimed for taxable years not at issue in the instant cases.[3]

After concessions,[4] the primary issues for decision in the instant cases (which petitioners raised in amended petitions) are: (1) Whether the nine Hoyt sheep partnerships are entitled to theft loss deductions under section 165 for each of the years at issue equal to the total cash payments made by the partners in each such year to the partnerships; (2) whether the period of limitations provided under section 6229 expired prior to the time that respondent issued FPAAs to some partnerships for certain taxable years; and (3) whether purported purchases of breeding sheep that some partnerships reported for pre-1989 taxable years constitute either (a) "valuation overstatement" as defined in

---

[3] River City Ranches #4, River City Ranches #6, and OGT 90 were the partnerships at issue in this test case. The taxable years decided were: For River City Ranches #4, 1987 and 1988, and its years ended Sept. 30, 1989 through 1991; and for River City Ranches #6, 1987 and 1988, and its years ended Sept. 30, 1989 through 1991. For OGT 90 the year decided was 1991.

[4] The parties have resolved all of the adjustments in each notice of final partnership administrative adjustment issued to each of the nine sheep partnerships. Among other things, petitioners now agree that the sheep partnerships did not acquire the benefits and burdens of ownership of any sheep and that the promissory note each partnership issued in connection with its purported acquisition of sheep is not a valid indebtedness.

section 6621(c)(3)(A)(i), or (b) "sham and fraudulent transaction" as defined in section 6621(c)(3)(A)(v).

FINDINGS OF FACT

Some of the facts and certain documents have been stipulated for trial pursuant to Rule 91 and are found accordingly. The Court incorporates the parties' stipulations in this opinion by reference.

The parties have stipulated that at the time the respective petitions herein were filed, each of the nine Hoyt sheep partnerships maintained its principal place of business in Burns, Oregon. However, the record reflects that the partnerships were operated from a Hoyt organization office located in Elk Grove, California. Further, each sheep partnership, with the exception of River City Ranches 85-2, was formed under and governed by California law. River City Ranches 85-2 was a Nevada general partnership and in 1991 became known as River City Ranches #7 (RCR #7).

A. Overview of the Hoyt Operations

Jay Hoyt's father was a prominent breeder of Shorthorn cattle, one of the three major breeds of cattle in the United States. In order to expand his business and attract investors, the father had started organizing and promoting cattle breeding partnerships by the late 1960s. Before and after the father's death in early 1972, Jay Hoyt and other members of the Hoyt

family were extensively involved in organizing and operating numerous cattle breeding partnerships.  From about 1971 through 1998, Jay Hoyt organized, promoted to thousands of investors, and operated as a general partner more than 100 cattle breeding partnerships.  For convenience, all or some of the cattle breeding partnerships hereinafter are sometimes referred to as the Hoyt cattle partnerships or cattle partnerships.[5]

Before 1971, the Hoyt family for many years resided in Sacramento, California, and conducted most of their cattle operations in northern California.  In 1975, the family started relocating their cattle operations to Burns, Oregon, because land prices became too expensive in northern California.  By the 1980s, the Hoyt family resided in the Burns area, and the Hoyt organization maintained offices in Burns, Oregon, and Elk Grove, California.

Around 1978 or 1979, Jay Hoyt became interested in the possibility of organizing sheep breeding partnerships similar to the cattle breeding partnerships.  Due to this interest, Jay Hoyt began discussions with David Barnes, a longtime sheep breeder and childhood friend.

David Barnes and his wife April Barnes owned and operated Barnes Ranch, their sole proprietorship sheep breeding business

---

[5] For a more detailed account of the Hoyt cattle operations and partnerships see Durham Farms #1, J.V. v. Commissioner, T.C. Memo. 2000-159, affd. 59 Fed. Appx. 952 (9th Cir. 2003).

located in California's Sacramento Valley.  The Barnes' son, Randy Barnes, eventually took on a substantial role in the management and operation of the family sheep business after completing college in 1985.

David Barnes had extensive experience in breeding several breeds of purebred sheep.  However, by the 1980s, he concentrated on Rambouillets and Suffolks.  Rambouillets have white faces and cream colored bodies and are a breed noted for producing good quality wool.  Suffolks, on the other hand, have black faces and legs and cream colored bodies and are a breed noted for producing good quality meat.  By the late 1980s, David Barnes and Randy Barnes had acquired very good reputations in purebred sheep breeding circles and generally were considered to be among the country's top breeders of Rambouillets and Suffolks.

As a result of various discussions and negotiations with David Barnes, Jay Hoyt decided to form, operate, and promote sheep partnerships in a very similar manner as the Hoyt cattle partnerships.

B.  Formation and Operation of the Hoyt Sheep Partnerships

From 1981 through 1991, Jay Hoyt formed eight of the nine sheep partnerships at issue under and pursuant to the laws of California.  RCR #7 was formed under and pursuant to the laws of Nevada.  From their inception, all nine sheep partnerships were operated from the Hoyt office located in Elk Grove, California.

The Certificate and Articles of Limited Partnership of River City Ranches Ltd. (RCR #1) states that the partnership was formed in 1981 as a limited partnership under and pursuant to the laws of the State of California. Jay Hoyt was designated the general partner, and the individual investors were collectively designated the limited partners.

The Certificate and Articles of Limited Partnership of River City Ranches #2 Ltd. (RCR #2) states that the partnership was formed in 1982 as a limited partnership under and pursuant to the laws of the State of California. Jay Hoyt was designated the general partner, and the individual investors were collectively designated the limited partners.

The Certificate of Limited Partnership of River City Ranches #3 Ltd. (RCR #3) states that the partnership was formed in 1983 as a limited partnership prepared and recorded under section 15502 of the California Corporations Code, Uniform Limited Partnership Act. Jay Hoyt was designated the general partner, and the individual investors were collectively designated the limited partners.

The Certificate and Articles of Limited Partnership of River City Ranches #4 Ltd. (RCR #4) states that the partnership was formed in 1984 as a limited partnership under and pursuant to the laws of the State of California. Jay Hoyt was designated the

general partner, and the individual investors were collectively designated the limited partners.

The Partnership Agreement of River City Ranches #5 Ltd. (RCR #5) states that the partnership was formed in 1985 as a general partnership under the laws of the State of California pursuant to the provisions of the Uniform Partnership Act. The agreement states that the Uniform Partnership Act of the State of California at the time of the partnership's formation or as may be thereafter amended shall govern the partnership. Jay Hoyt and W.J. Hoyt Sons Management Co. (Management) were designated the managing partners, and the individual investors were collectively designated as the investing partners. All the investing partners were general partners of the partnership and not limited partners, as in the previous sheep partnerships.

The Partnership Agreement of River City Ranches #6 Ltd. (RCR #6) states that the partnership was formed in 1986 as a general partnership under the laws of the State of California pursuant to the provisions of the Uniform Partnership Act. The agreement states that the Uniform Partnership Act of the State of California at the time of the partnership's formation or as may be thereafter amended shall govern the partnership. Jay Hoyt was designated the managing partner, and the individual investors were collectively designated as the investing partners. All the investing partners were general partners of the partnership.

The Partnership Agreement of Ovine Genetic Technology Syndicate 1987-1, J.V. (OGT 87) states that the partnership was formed in 1987 as a general partnership under the laws of the State of California pursuant to the provisions of the Uniform Partnership Act. The agreement states that the Uniform Partnership Act of the State of California at the time of the partnership's formation or as may be thereafter amended shall govern the partnership. Jay Hoyt and Management were designated the managing partners, and the individual investors were collectively designated as the investing partners. All the investing partners were general partners of the partnership.

The record does not contain any partnership agreements for RCR #7 or Ovine Genetic Technology 1990 (OGT 90). However, other documents in the record indicate that RCR #7 is a Nevada general partnership governed by the Uniform Partnership Act of the State of Nevada, and OGT 90 is a California general partnership governed by the Uniform Partnership Act of the State of California.

From the time each Hoyt sheep partnership was formed through 1998, Jay Hoyt was the general partner responsible for all the management, operation, and promotion functions. He maintained power of attorney to manage and conduct partnership business. Jay Hoyt oversaw the entire Hoyt operation and made all major decisions.

Jay Hoyt was also the tax matters partner (TMP) of each partnership and was a licensed enrolled agent. As an enrolled agent he represented many of the investor-partners before the Internal Revenue Service (IRS). In 1997, the IRS disbarred Jay Hoyt as an enrolled agent for certain alleged improprieties relating to his individual income tax returns. By orders of the Tax Court issued from June 22, 2000, through May 15, 2001, Jay Hoyt was removed as TMP from the sheep partnerships.

From April 1981 through February 1987, Jay Hoyt, representing each of the Hoyt sheep partnerships (excluding OGT 90)[6], entered into agreements with David Barnes to purchase Rambouillet and Suffolk breeding ewes from Barnes Ranch for each of the partnerships. The separate agreements that each partnership entered into with Barnes Ranch were substantially similar in all material respects. Each agreement contained terms for the partnerships to purchase the sheep with no money down by each issuing Barnes Ranch a promissory note. The partners of each partnership then personally assumed the partnership debt under an assumption agreement. Further, each partnership entered into a share-crop operating agreement with Barnes Ranch to manage

---

[6] In the River City Ranches #4 test case, Jay Hoyt maintained that OGT 90 in 1990 entered into sheep sale and share-crop management agreements with W.J. Hoyt Sons Ranches MLP, not with Barnes Ranch. However, during that test case trial, David Barnes testified that Barnes Ranch had sold OGT 90 its "breeding sheep". See River City Ranches #4, J.V. v. Commissioner, T.C. Memo. 1999-209, affd. 23 Fed. Appx. 744 (9th Cir. 2001).

and pay all expenses with respect to each partnership's breeding sheep.

The dates on which the purchase agreements each of the eight partnerships and Barnes Ranch entered into, the number of purported breeding ewes each partnership allegedly acquired, the total stated purchase price, and the average price per sheep each partnership agreed to pay for its sheep are as follows:

| Partnership | Date of Entry | Number of Ewes | Total Purchase Price | Avg. Price per Sheep |
|---|---|---|---|---|
| RCR #1 | 4-20-81 | 401 | $455,100 | $1,135 |
| RCR #2 | 2-15-82 | 514 | 626,400 | 1,219 |
| RCR #3 | 3-20-83 | 584 | 713,140 | 1,221 |
| RCR #4 | 2-01-84 | 1,468 | 2,087,880 | 1,422 |
| RCR #5 | 5-01-85 | 1,257 | 1,825,000 | 1,452 |
| RCR #6 | 1-15-86 | 1,415 | 1,960,140 | 1,385 |
| RCR #7 | 2-01-87 | 1,873 | 3,982,360 | 2,126 |
| OGT 87 | 1-05-87 | 1,849 | 3,636,600 | 1,967 |

Each of the nine sheep partnerships at issue was supposedly formed to operate as a sheep breeding partnership, owning its own flock of sheep purchased from Barnes Ranch. However, Jay Hoyt and David Barnes were not independent parties acting at arm's length with respect to any of the sheep agreements. In actuality, none of the sheep partnerships acquired the benefits and burdens of ownership of any of the sheep listed above.

The bills of sale that Barnes Ranch issued the sheep partnerships (excluding OGT 90) listed large numbers of individual breeding sheep that did not exist. The flock recap sheets prepared by Jay Hoyt contained false information and did

not represent the sheep purportedly owned by each partnership. Further, the total purchase price that each partnership agreed to pay for its sheep was many times the fair market value of similar quality sheep. Additionally, it was determined that none of the promissory notes that the sheep partnerships issued for their sheep were bona fide recourse debt. The notes had no economic effect to the partnerships and were not valid indebtedness. Moreover, Barnes Ranch did not even provide the partnerships with the management services required under the agreements.

The cattle and sheep partnerships were organized and operated in essentially the same manner. In addition, all of the Hoyt organization investor partnerships were marketed and promoted in an identical fashion. Jay Hoyt even used the promotional literature prepared for the cattle partnerships to promote the sheep partnerships. Some of the investors placed in the sheep partnerships believed they had invested in cattle partnerships.

In the early 1980s with the formation of many more investor partnerships, the documents, records, and tax returns the Hoyt organization prepared relating to its transactions with the cattle partnerships were inaccurate, unreliable, and in many instances falsified. Likewise, the Hoyt organization prepared and maintained the sheep partnerships' documents, records, and tax returns in an inaccurate and unreliable manner. These

deficient record-keeping practices continued for both the cattle and sheep partnerships through 1998, when all the investor partnerships were consolidated for bankruptcy purposes.  For the years at issue, often no records were kept at all.

As the general partner managing each sheep partnership, Jay Hoyt was responsible for and directed the preparation of the tax returns of each partnership, and he typically signed and filed each tax return.  However, separate bookkeeping and accounting records for each of the sheep partnerships were never maintained.

Nor did Jay Hoyt maintain separate bank accounts for each of the sheep partnerships.  From 1981 until sometime in 1990, checks from the sheep partners were received at the Hoyt office in Elk Grove, California, and deposited in one checking account.  The account was in the name of River City Ranches (RCR account) and maintained at the Bank of Alex Brown located in Elk Grove, California.[7]

Sometime in 1990, Jay Hoyt discontinued using the RCR account.  He implemented a new business practice of commingling all Hoyt organization funds in one checking account referred to as the pooling account.  This account was in the name of W.J. Hoyt Sons Ranches MLP (MLP) and maintained at the First Interstate Bank in Elk Grove, California.  The funds in the

---

[7]  The Bank of Alex Brown became the First Interstate Bank in 1989.

pooling account were then allocated to the various Hoyt entities based on a percentage determined by a pooling committee administered by Jay Hoyt.  The duration of the pooling account cannot be determined by the record.  During the years at issue, substantial sums were deposited into and withdrawn by check from both the RCR account and the pooling account.

At the end of 1993 or early 1994, the sheep partnerships' promissory notes and share-crop management agreements were assigned to MLP.  From that point on, MLP was responsible for providing the various functions that were previously the responsibility of Barnes Ranch.

C.    Respondent's Examination Efforts and Enforcement Actions

Since approximately 1980, the IRS regularly examined many of the partnership returns of the Hoyt cattle partnerships and the individual returns of their partners.  The IRS also examined the sheep partnerships' returns and the individual returns of their partners.  Because Jay Hoyt did not maintain separate bank accounts and accurate accounting records for each of the sheep partnerships, the IRS audited the partnership tax returns as a group.  The IRS generally disallowed the partnership tax benefits that each cattle and sheep partnership and their respective partners claimed, resulting in those partnerships and partners commencing numerous cases in the Tax Court.

The Tax Court litigation over the years concerning the Hoyt

cattle and sheep partnerships includes: (1) <u>Bales v. Commissioner</u>, T.C. Memo. 1989-568; <u>River City Ranches #4, J.V. v. Commissioner</u>, T.C. Memo. 1999-209, affd. 23 Fed. Appx. 744 (9th Cir. 2001); and <u>Durham Farms #1, J.V. v. Commissioner</u>, T.C. Memo. 2000-159, affd. 59 Fed. Appx. 952 (9th Cir. 2003), three test cases dealing with partnership adjustments; (2) numerous other cases involving the 1980 through 1986 taxable years of Hoyt cattle partnerships and their partners that essentially were resolved after respondent and Jay Hoyt entered into a memorandum of understanding (MOU) on May 20, 1993, which outlined a basis for a settlement of all outstanding cattle partnership cases for the 1980 through 1986 taxable years; and (3) the instant case involving the nine Hoyt sheep partnerships.

From 1984 through 2000, the IRS's tax enforcement efforts with respect to the tax shelter program operated by Jay Hoyt included: (1) Examinations of the returns of the cattle and sheep partnerships and their partners; (2) disallowance of the partnership tax benefits that were claimed; (3) issuance of prefiling notices to partners and freezing tax refunds they claimed; and (4) defending litigation commenced in the Tax Court by partnerships and partners over the adjustments determined in the FPAAs and notices of deficiency issued by respondent.

From the IRS examinations of the returns of all the cattle and sheep partnerships and investor-partners through this Tax

Court litigation, IRS personnel either strongly suspected or believed these partnerships to be abusive tax shelters. The IRS's original position had been that the purported acquisitions of breeding animals by the cattle and sheep partnerships lacked economic substance (i.e., were economic shams), that the partnerships' stated purchase prices for the animals greatly exceeded the fair market value of the animals, and that the promissory note each partnership issued in connection with its purported acquisition of breeding animals was not a valid indebtedness.

The holding in Bales v. Commissioner, T.C. Memo. 1989-568, however, set back considerably the IRS's tax enforcement efforts against Jay Hoyt and the cattle and sheep partnerships that he promoted and operated under his tax shelter program. In Bales, this Court did not sustain the IRS's disallowance of many of the tax benefits a number of partners in specific cattle partnerships involved therein claimed for 1977, 1978, and 1979. This Court, among other things, found that the Bales partnerships had acquired the benefits and burdens of ownership with respect to specific breeding cattle, that the purchase prices for the partnership cattle did not exceed their fair market value, and that the promissory notes these partnerships issued were valid recourse indebtedness.

The Examination Division examined many of the returns of the cattle and sheep partnerships and their partners for the 1980 through 1986 taxable years. During the Bales litigation, the Examination Division obtained extensions from the partners in the cattle partnerships to extend the period of limitations for assessing and collecting income tax liabilities for the 1980, 1981, and 1982 tax years.[8] After obtaining the extensions, the Examination Division temporarily suspended examination activity with respect to those tax years.

In early 1989, the Examination Division resumed examining and processing the individual returns filed by partners in the cattle partnerships for the 1980, 1981, and 1982 tax years. Shortly thereafter, standard revenue agent reports for those years were prepared that proposed to disallow all tax benefits these partners had claimed from the cattle partnerships.

From about 1988 through 1991, an Examination Division team conducted partnership-level examinations of many of the returns of the cattle and sheep partnerships for the 1983 through 1986

---

[8] The unified partnership audit and litigation provisions of secs. 6221-6233, are not applicable to the pre-1983 taxable years of the cattle and sheep partnerships. These provisions were enacted as part of the Tax Equity & Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 402(a), 96 Stat. 324, 648, and are generally applicable to partnership taxable years beginning after Sept. 3, 1982.

taxable years.[9]  During these examinations, Jay Hoyt and the Hoyt organization failed to provide adequate documents and records substantiating the livestock the partnerships purportedly acquired and owned.

Following the 1989 Bales opinion, the IRS attempted to verify the existence of all purported livestock that the cattle and sheep partnerships allegedly owned for post-1979 taxable years.  As a result of an administrative summons enforcement action brought in the United States District Court for the District of Oregon (U.S. District Court) in 1992, the IRS first inspected and counted all the purported cattle and sheep that these partnerships allegedly owned from fall 1992 through spring 1993.  The livestock count and inspection were conducted in connection with the IRS's examinations of the post-1986 taxable year returns of the partnerships.

By February 1993, although the IRS's inspection and livestock count were not fully completed, IRS personnel concluded that Jay Hoyt and the Hoyt organization had greatly overstated the number of actual breeding animals that these partnerships claimed to own.  The IRS further concluded that Jay Hoyt and the Hoyt organization had also grossly overvalued the livestock upon which the partnerships were claiming tax benefits.

---

[9]  The unified partnership audit and litigation provisions of secs. 6221-6233, applied to these partnership taxable years. See supra note 8.

Based on the above conclusions from its count of the cattle and sheep, the IRS, beginning in February 1993, generally froze and stopped issuing income tax refunds to partners in the cattle and sheep partnerships. The IRS issued prefiling notices to the investor-partners advising them that, starting with the 1992 taxable year, the IRS would (1) disallow the tax benefits that the partners claimed on their individual returns from the cattle and sheep partnerships and (2) not issue any tax refunds these partners might claim attributable to such partnership tax benefits.[10]

Respondent eventually issued: (1) Notices of deficiency to numerous investor-partners for the 1980, 1981, and 1982 tax years, in which respondent determined that none of the tax benefits the partners claimed from the cattle and sheep partnerships were allowable; and (2) FPAAs to many of the cattle and sheep partnerships for the taxable years 1983, 1984, 1985, and 1986, in which respondent disallowed the tax benefits these partnerships claimed.

Following the IRS's freezing in February 1993 of tax refunds to partners in the cattle and sheep partnerships, the Hoyt organization experienced financial difficulties. Freezing the

---

[10] Ultimately, this Court, in Durham Farms #1, J.V. v. Commissioner, T.C. Memo. 2000-159, and River City Ranches #4, J.V. v. Commissioner, T.C. Memo. 1999-209, upheld respondent's disallowance of almost all tax benefits claimed by those cattle and sheep partnerships for certain post-1986 taxable years.

tax refunds greatly diminished the amount of money the Hoyt organization obtained from new and existing partners.

After the opinion in <u>Bales</u> was filed and appropriate decisions were entered, settlement negotiations were conducted between Jay Hoyt and the IRS, which culminated in the MOU.

Beginning in 1993, an increasing number of investor-partners were becoming disgruntled with Jay Hoyt and the Hoyt organization. Many partners stopped making their partnership payments and withdrew from their partnerships, due in part to respondent's tax enforcement. Jay Hoyt urged the partners to support and remain loyal to the organization in challenging the IRS's actions. The Hoyt organization warned that partners who stopped making their partnership payments and withdrew from their partnerships (1) would be reported to the IRS as having substantial debt relief income and (2) would have to deal with the IRS on their own.

On or about June 8, 1995, in the 32d Judicial District Court for the Parish of Terrebonne, State of Louisiana, a group of investors obtained an $11 million default judgment against Jay Hoyt, Management, MLP, and several cattle breeding partnerships for fraud and other violations. See <u>Mabile, et al. v. Walter J. Hoyt, III, et al.</u>, No. 95-112222. On February 24, 1997, the plaintiffs in the Louisiana lawsuit filed involuntary bankruptcy petitions in the U.S. Bankruptcy Court for the District of Oregon

(Bankruptcy Court) to force Management and MLP into bankruptcy and liquidate each company's assets. On June 5, 1997, the Bankruptcy Court entered an order for relief, in effect finding that Management and MLP were both bankrupt.

In the Management and the MLP bankruptcy cases, the United States Trustee (U.S. Trustee), in 1997, moved to have the Bankruptcy Court substantively consolidate all assets and liabilities of almost all Hoyt organization entities and the many Hoyt investor partnerships. This consolidation included all the cattle and sheep partnerships. On November 13, 1998, the Bankruptcy Court entered its Judgment for Substantive Consolidation, consolidating all the above mentioned entities for bankruptcy purposes. The U.S. Trustee then sold off what little livestock that the Hoyt organization owned and/or managed on behalf of the cattle and sheep partnerships.

From 1992 through 1998, the IRS at various times issued standard letters to investor-partners advising them of the IRS's position in disputing the claimed tax benefits from the cattle and sheep partnerships. From 1992 through 1998, Revenue Agent Norman Johnson and other IRS employees discussed the IRS's position with hundreds of investor-partners in the cattle and sheep partnerships. Many of the discussions addressed the confusion various partners had regarding certain tax issues as a result of the conflicting information and tax advice that Jay

Hoyt and the Hoyt organization provided the investor-partners.

Respondent ultimately issued FPAAs to the cattle and sheep partnerships for post-1986 taxable years, in which respondent disallowed the tax benefits these partnerships claimed for those years. These partnerships then commenced numerous Tax Court cases for a redetermination of the FPAA adjustments.

On June 22, 1999, this Court issued its opinion in River City Ranches #4, J.V. v. Commissioner, T.C. Memo. 1999-209, a test case sustaining respondent's disallowance of all tax benefits claimed by three sheep partnerships. On May 18, 2000, this Court issued its opinion in the Durham Farms #1, J.V. v. Commissioner, T.C. Memo. 2000-159, a test case in which the Court disallowed almost all tax benefits that seven cattle partnerships claimed. In light of these holdings and the mounting evidence, petitioners conceded the various partnership adjustments, choosing to focus on the issues raised in their amended petition.

D.   Governmental Investigations of Jay Hoyt

After the initial IRS examinations of the many cattle and sheep partnerships, several investigations by various Government agencies were commenced relating to Jay Hoyt's activities.

From 1984 through 1986, the IRS's Criminal Investigation Division (CID) conducted an investigation of Jay Hoyt for allegedly backdating documents to enable 12 investor-partners to claim improper deductions and credits for 1980, 1981, and 1982.

On July 31, 1986, the IRS District Counsel's Office in Sacramento, California, referred the matter to the Department of Justice (DOJ) for prosecution.

The DOJ then forwarded the matter to the U.S. Attorney's Office in Sacramento for review and consideration. On August 12, 1987, the U.S. Attorney's Office declined to prosecute Jay Hoyt. The Assistant U.S. Attorney assigned to consider the possible criminal tax prosecution concluded that: (1) The total tax loss to the Government from the backdating was relatively small, probably less than $30,000; and (2) it would be difficult to obtain a conviction of Jay Hoyt in a jury trial.

In July 1989, a member of the IRS Examination Division team (which had been examining the returns of many of the cattle and sheep partnerships for the 1983 through 1986 taxable years) recommended that the CID investigate Jay Hoyt for allegedly making and/or assisting in fraudulent or false tax return statements in connection with his promotion and operation of the cattle partnerships. In his referral report to the CID, this team member concluded that Jay Hoyt was selling cattle to some partnerships that had already been sold to other partnerships and that he was depreciating cattle that did not exist. The CID then conducted an investigation of the alleged nonexistent cattle and Jay Hoyt's represented value for them. CID's investigation was completed no later than October 1, 1990.

On October 13, 1989, during the CID's above-mentioned investigation, the U.S. Attorney's Office in Sacramento requested that the CID review certain information and determine whether IRS special agents from the CID should join in an ongoing grand jury investigation of Jay Hoyt for possible violations of the Internal Revenue laws. On November 3, 1989, the IRS Regional Counsel's Office requested that IRS special agents be authorized to participate in the grand jury investigation. On October 2, 1990, the U.S. Attorney's Office ended the grand jury investigation of Jay Hoyt without an indictment.

On or about August 31, 1993, the CID commenced an investigation of Jay Hoyt for possible criminal violations of the Internal Revenue laws due to his alleged misrepresentation of the total number and value of purported cattle that the cattle partnerships allegedly owned. The CID closed the investigation on or about October 7, 1993, and did not recommend that the IRS attempt to have Jay Hoyt prosecuted.

On or about September 8, 1995, the CID commenced an investigation of Jay Hoyt for possible criminal violations of the Internal Revenue laws relating to the alleged shortage of cattle from the Hoyt cattle partnerships. The CID closed this investigation on September 29, 1995, and did not recommend that the IRS attempt to have Jay Hoyt prosecuted.

From 1993 through 1998, other governmental agencies also investigated Jay Hoyt, including the Securities and Exchange Commission (SEC), the United States Postal Service (USPS), and the U.S. Trustee. As a result of a referral for further investigation from the U.S. Attorney's Office in Seattle, Washington, to the USPS, postal inspectors in late 1993 commenced an investigation of Jay Hoyt and the Hoyt organization for possible mail fraud violations.

During 1993 and 1994, the SEC conducted an ongoing investigation of Jay Hoyt, but the SEC eventually closed its investigation and deferred to the USPS's investigation of Jay Hoyt that had been commenced in late 1993. In June 1995, postal inspectors seized numerous documents and records from the offices of the Hoyt organization pursuant to a search warrant.

In 1995, Hoyt & Sons Ranch Properties (HSRP) partnership, one of the Hoyt organization's ranch land partnerships, filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court. After the bankruptcy filing, the U.S. Trustee commenced an investigation of Jay Hoyt for possible gross mismanagement or bankruptcy fraud in connection with HSRP. The U.S. Trustee also investigated Jay Hoyt in connection with the Management and MLP bankruptcy cases commenced in 1997.

On November 24, 1998, the Government filed an indictment in the U.S. District Court against Jay Hoyt and several other

persons who had worked for or engaged in transactions with the Hoyt organization, including April and David Barnes, charging them with numerous counts of conspiracy and mail fraud. On June 2, 1999, the Government filed a superseding indictment against the same defendants, which, among other things, charged Jay Hoyt with 54 counts of conspiracy to commit fraud, mail fraud, bankruptcy fraud, and money laundering. See United States v. Barnes, et al., No. CR 98-529-JO-04 (D. Or. Feb. 12, 2001), affd. sub nom. United States v. Hoyt, 47 Fed. Appx. 834 (9th Cir. 2002). All future references to Jay Hoyt's indictment are to the superseding indictment of June 2, 1999.

Following a jury trial in the U.S. District Court case noted above, on February 12, 2001, Jay Hoyt was convicted of 1 count of conspiracy to commit fraud, 31 counts of mail fraud, 3 counts of bankruptcy fraud, and 17 counts of money laundering. See id. The U.S. District Court then sentenced Jay Hoyt to 235 months of imprisonment and also ordered him to pay restitution of over $102 million to the individual victims of his crimes. This $102 million figure represented the total amount that the Government (using Hoyt organization records) determined was paid to the Hoyt organization from 1982 through 1998 by investor-partners in the cattle partnerships, the sheep partnerships, and other similar partnerships that Jay Hoyt promoted. The fraud perpetrated by Jay Hoyt "impacted over 4,000 people and had actual and intended

losses exceeding $200 million." <u>United States v. Hoyt</u>, 47 Fed. Appx. 834, 837 (9th Cir. 2002).

Following the Government's filing in late 1998 of the indictment against Jay Hoyt, respondent moved this Court to remove Jay Hoyt as TMP in many of the cattle and sheep partnership cases before the Tax Court.  In orders issued from June 22, 2000, through May 15, 2001, this Court removed Jay Hoyt as TMP in numerous cattle and sheep partnership cases, pursuant to Rule 250(b).

E.   <u>Certain Agreements Extending the Period of Limitations That Jay Hoyt and the IRS Executed</u>

Jay Hoyt and the IRS executed agreements extending the period of limitations on assessments for certain taxable years of RCR #2, RCR #3, RCR #4, RCR #5, and RCR #7.  Jay Hoyt executed each of the extension agreements as TMP for the various sheep partnerships.

The partnership taxable year involved, the date upon which the partnership filed its return for that year, the IRS extension form used, the respective dates upon which Jay Hoyt and the IRS executed the various forms, the date to which Jay Hoyt and the IRS (in the form) agreed to extend the period of limitations, and the date upon which respondent issued each partnership the FPAA are as set forth below:

| Partnership | Taxable Year Ended | Date Return Filed | IRS Form | Date Executed Hoyt | Date Executed IRS | Date to Which Extended | Date FPAA Issued |
|---|---|---|---|---|---|---|---|
| RCR #2 | 12-31-87 | 05-19-88 | 872-P | 02-15-91 | 02-27-91 | 12-31-92 | 12-20-93 |
| | | | 872 | 04-06-91 | 04-10-91 | 12-31-92 | |
| | | | 872 & 872-P | 07-25-92 | 08-26-92 | 06-30-93 | |
| | | | 872-P | 03-06-93 | 03-29-93 | 12-31-93 | |
| RCR #3 | 12-31-87 | 10-20-88 | 872-P | 02-15-91 | 02-22-91 | 12-31-92 | 12-20-93 |
| | | | 872 | 04-06-91 | 04-10-91 | 12-31-92 | |
| | | | 872-P & 872 | 07-25-92 | 08-26-92 | 06-30-93 | |
| | | | 872-P | 03-06-93 | 03-30-93 | 12-31-93 | |
| RCR #3 | 09-30-89 | 04-15-90 | 872-P & 872 | 07-25-92 | 08-26-92 | 06-30-93 | 12-20-93 |
| | | | 872-P | 03-06-93 | 03-30-93 | 12-31-93 | |
| RCR #4 | 12-31-84 | 10-18-85 | 872-O | 08-01-87 | 08-01-87 | Indefinite | 03-25-96 |
| RCR #5 | 12-31-87 | 10-21-88 | 872-P | 02-15-91 | 02-22-91 | 12-31-92 | 12-20-93 |
| | | | 872 | 04-06-91 | 04-10-91 | 12-31-92 | |
| | | | 872-P & 872 | 07-25-92 | 08-26-92 | 06-30-93 | |
| RCR #5 | 12-31-88 | 10-17-89 | 872-P | 02-15-91 | 02-22-91 | 12-31-92 | 12-20-93 |
| | | | 872 | 04-06-91 | 04-10-91 | 12-31-92 | |
| | | | 872-P & 872 | 07-25-92 | 08-26-92 | 06-30-93 | |
| | | | 872-P | 03-06-93 | 03-30-93 | 12-31-93 | |
| RCR #5 | 09-30-89 | 04-15-90 | 872-P & 872 | 07-25-92 | 08-26-92 | 06-30-93 | 12-20-93 |
| | | | 872-P | 03-06-93 | 03-30-93 | 12-31-93 | |
| RCR #7 | 12-31-87 | 10-20-88 | 872-P | 02-15-91 | 02-22-91 | 12-31-92 | 12-20-93 |
| | | | 872 | 04-06-91 | 04-10-91 | 12-31-92 | |
| | | | 872-P & 872 | 07-25-92 | 08-26-92 | 06-30-93 | |
| | | | 872-P | 03-06-93 | 03-30-93 | 12-31-93 | |
| RCR #7 | 12-31-88 | 10-17-89 | 872-P | 02-15-91 | 02-22-91 | 12-31-92 | 12-20-93 |
| | | | 872 | 04-06-91 | 04-10-91 | 12-31-92 | |
| | | | 872-P & 872 | 07-25-92 | 08-26-92 | 06-30-93 | |
| | | | 872-P | 03-06-93 | 03-30-93 | 12-31-93 | |
| RCR #7 | 09-30-89 | 04-15-90 | 872-P & 872 | 07-25-92 | 08-26-92 | 06-30-93 | 12-20-93 |
| | | | 872-P | 03-06-93 | 03-30-93 | 12-31-93 | |

## OPINION

Petitioners bear the burden of proof on all issues raised in their amended petitions. Rules 142(a), 240(a); Welch v. Helvering, 290 U.S. 111 (1933).

Issue 1.  Entitlement to Partnership Level Theft Loss Deductions

A.   The Parties' Arguments

   1.   Petitioners' Arguments

It is our understanding that the gist of petitioners' theory regarding entitlement to a theft loss deduction for each taxable year at issue is as follows:  (1) Each of the nine sheep partnerships was the victim of a theft by Jay Hoyt because his conviction in the U.S. District Court for specific Federal crimes establishes the existence of the theft[11]; (2) since Oregon is where the partnerships were formed and operated, Oregon is the jurisdiction where the thefts occurred; (3) Oregon criminal statutes that are similar to the Federal criminal statutes Jay Hoyt was convicted of violating are evidence that Jay Hoyt's Federal crimes are also crimes in Oregon; and (4) each partnership is entitled to a theft loss deduction equal to the total amount of cash invested by the partners in each year.

Further, petitioners contend that the Government's successful prosecution of Jay Hoyt precludes respondent, under doctrines of collateral and/or judicial estoppel, from denying that the Hoyt sheep partnerships and their investor-partners were victims of a theft.

---

[11]  The details of Jay Hoyt's criminal conviction and specific crimes for which he was found guilty are discussed supra pp. 28-30.

While petitioners argue that a theft occurred in each year equal to the total amount of cash contributed in that year, they admit that each of the sheep partnerships did not discover the alleged thefts until after the years at issue. However, petitioners argue that this Court should apply the doctrine of equitable estoppel and the Ninth Circuit's holding in Rod Warren Ink v. Commissioner, 912 F.2d 325, 326 (9th Cir. 1990), revg. 92 T.C. 995 (1989), to the "exceptional circumstances" presented in this case, to override section 165(e) and allow each partnership to deduct a theft loss for each of the years at issue. Petitioners acknowledge that they seek this remedy to reduce the amount of interest that individual partners will be assessed as a result of the partnership adjustments.

Petitioners assert that if the IRS had warned the investor-partners that serious problems existed and disclosed information the IRS had regarding Jay Hoyt's diverting of their funds and selling of nonexistent sheep to their partnerships, the partners would not have continued investing in the partnerships and would have stopped their payments to the Hoyt organization. At a minimum, petitioners state, these partners might have been able to discover the theft earlier, allowing the partnerships and themselves to claim earlier offsetting theft loss deductions. Petitioners thus maintain that each partnership under equitable principles should be allowed a theft loss deduction for each of

the years at issue equal to the cash payments made by the partners to the partnerships during those years.

### 2. Respondent's Arguments

Respondent contends that the Hoyt sheep partnerships are not entitled to theft loss deductions for any of the years at issue. Respondent argues that petitioners have failed to satisfy all of the requirements under section 165 for deducting a theft loss. Specifically, respondent asserts that petitioners have failed to establish: (1) The partnerships, as opposed to the partners, were victims of a theft; (2) the amount of the alleged theft; (3) that the alleged theft from each partnership was discovered during the 1984 through 1996 years at issue; and (4) that no reasonable prospect for recovery existed during the years at issue.

Respondent states that in United States v. Barnes, et al., No. CR 98-529-JO-04 (D. Or. Feb. 12, 2001), the Government's prosecution focused on the activities of Jay Hoyt, other co-defendants, and the Hoyt organization in promoting and operating the cattle partnerships, not the sheep partnerships. Hence, respondent maintains that collateral estoppel and judicial estoppel are inapplicable, as the Government's conviction of Jay Hoyt neither establishes a theft from the sheep partnerships nor precludes respondent from denying that the sheep partnerships

were victims of a theft.[12]

Respondent disputes that equitable estoppel or the Rod Warren Ink case should be applied to override section 165(e) and allow the partnerships theft loss deductions for the years at issue. Respondent asserts that petitioners have failed to establish: (1) The IRS misled the partnerships and their partners about Jay Hoyt's fraudulent activities against them; and (2) the partnerships and their partners reasonably relied to their detriment on the IRS's alleged failure to stop and disclose Jay Hoyt's promotion of the cattle and sheep partnerships at an earlier date. Additionally, respondent adds that the Court of Appeals for the Ninth Circuit requires "affirmative misconduct" by the Government as a threshold matter before deciding whether the traditional requirements of equitable estoppel are met. Respondent disputes that there was affirmative misconduct by the IRS.

B.   Discussion of Applicable Law

   1.   Section 165 Theft Loss

Section 165 generally allows a taxpayer to deduct losses

_____

[12] In this connection, Jeffrey Hull (the postal inspector who investigated Jay Hoyt and later worked with the prosecution team) testified that the criminal case focused on the cattle partnerships and not the sheep partnerships. Mr. Hull explained that his investigation had focused upon the cattle partnerships since they represented the majority of the investor partnerships, and that he and others saw no point in having to address collateral issues concerning the sheep partnerships.

from the theft of property.  Sec. 165(a), (c)(3).  Petitioners bear the burden of proving by a preponderance of the evidence that a theft actually occurred.  Rule 142(a); Jones v. Commissioner, 24 T.C. 525, 527 (1955); Allen v. Commissioner, 16 T.C. 163, 166 (1951); Ginesky v. Commissioner, T.C. Memo. 1994-551.

To carry this burden of proof, section 165 requires petitioners to establish all the required elements of a theft loss.  Yates v. Commissioner, T.C. Memo. 1988-565.  First, petitioners must show that a theft occurred under the law of the jurisdiction wherein the alleged loss occurred.  Monteleone v. Commissioner, 34 T.C. 688, 692 (1960).  Second, petitioners must prove the amount of the theft loss.  Gerstell v. Commissioner, 46 T.C. 161, 175 (1966); sec. 1.165-8(c), Income Tax Regs.  Third, petitioners must establish the date that the loss from theft was discovered.  Sec. 165(e); McKinley v. Commissioner, 34 T.C. 59, 63 (1960); sec. 1.165-8(a), Income Tax Regs.

For purposes of section 165, "any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss."  Sec. 165(e); sec. 1.165-8(a)(2), Income Tax Regs.  However, if in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, only that portion of the loss not covered by that claim for reimbursement is

considered sustained by the taxpayer.  Viehweg v. Commissioner, 90 T.C. 1248, 1255-1256 (1988); secs. 1.165-8(a)(2), 1.165-1(d)(2)(ii), Income Tax Regs.

As used in section 165, the term "theft" is a word of general and broad connotation, intended to cover any criminal appropriation of another's property, including theft by larceny, embezzlement, obtaining money by false pretenses, and any other form of guile.  Bellis v. Commissioner, 61 T.C. 354, 357 (1973), affd. 540 F.2d 448 (9th Cir. 1976); see sec. 1.165-8(d), Income Tax Regs.  Whether a loss from theft has occurred for purposes of section 165 is determined under the laws of the State wherein the loss allegedly was sustained.  Bellis v. Commissioner, 540 F.2d 448, 449 (9th Cir. 1976), affg. 61 T.C. 354 (1973).  However, a Federal criminal statute may provide the requisite criminality allowing a taking of a taxpayer's property to be considered a theft for purposes of section 165.  E.g., Nichols v. Commissioner, 43 T.C. 842, 884-885 (1965)(holding Federal mail fraud to be a theft for purposes of section 165).

2.   Estoppel Principles

a.    Equitable Estoppel

"Equitable estoppel is a judicial doctrine that 'precludes a party from denying his own acts or representations which induced another to act to his detriment.'"  Hofstetter v. Commissioner, 98 T.C. 695, 700 (1992)(quoting Graff v. Commissioner, 74 T.C.

743, 761 (1980), affd. 673 F.2d 784 (5th Cir. 1982)).  It is well established that the doctrine of equitable estoppel should be applied against the Commissioner in tax cases "'with the utmost caution and restraint.'"  Kronish v. Commissioner, 90 T.C. 684, 695 (1988) (quoting Boulez v. Commissioner, 76 T.C. 209, 214-215 (1981), affd. 810 F.2d 209 (D.C. Cir. 1987)).  Further, the Supreme Court has stated that the Government may not be estopped on the same grounds as other litigants.  OPM v. Richmond, 496 U.S. 414, 419 (1990); Heckler v. Community Health Servs., 467 U.S. 51, 60 (1984).

The following conditions must be satisfied before equitable estoppel will be applied against the Government:  (1) A false representation or wrongful, misleading silence by the party against whom the opposing party seeks to invoke the doctrine; (2) an error in a statement of fact and not in an opinion or statement of law; (3) ignorance of the true facts; (4) reasonable reliance on the acts or statements of the one against whom estoppel is claimed; and (5) adverse effects of the acts or statement of the one against whom estoppel is claimed.  See Kronish v. Commissioner, supra, and cases cited therein.  Thus, the doctrine requires a finding that a claimant relied on the Government's representations and suffered a detriment because of that reliance.  Norfolk S. Corp. v. Commissioner, 104 T.C. 13, 60 (1995), affd. 140 F.3d 240 (4th Cir. 1998).

In addition to the traditional elements of equitable estoppel, the Court of Appeals for the Ninth Circuit requires the party seeking to apply the doctrine against the Government to prove affirmative misconduct.  See <u>Purcell v. United States</u>, 1 F.3d 932, 939 (9th Cir. 1993), and cases cited.  The aggrieved party must prove "'affirmative misconduct going beyond mere negligence'" and, even then, "'estoppel will only apply where the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage by imposition of the liability.'"  <u>Purer v. United States</u>, 872 F.2d 277, 278 (9th Cir. 1989) (quoting <u>Wagner v. Director, Fed. Emergency Mgmt. Agency</u>, 847 F.2d 515, 519 (9th Cir. 1988)).  Affirmative misconduct requires "ongoing active misrepresentations" or a "pervasive pattern of false promises," as opposed to an isolated act of providing misinformation.  <u>Watkins v. United States Army</u>, 875 F.2d 699, 708 (9th Cir. 1989).  Affirmative misconduct is a threshold issue to be decided before determining whether the traditional elements of equitable estoppel are present.  See <u>Purcell v. United States</u>, <u>supra</u> at 939.

b.    <u>Collateral Estoppel</u>

Collateral estoppel basically precludes parties and their privies from relitigating issues actually and necessarily litigated and decided in a final prior judgment by a court of competent jurisdiction.  <u>Peck v. Commissioner</u>, 90 T.C. 162, 166

(1988), affd. 904 F.2d 525 (9th Cir. 1990). For collateral estoppel to apply in a factual context, the following conditions must be met: (1) The issue in the second suit must be identical in all respects with the one decided in the first suit; (2) there must be a final judgment rendered by a court of competent jurisdiction; (3) collateral estoppel may be invoked against parties and their privies to the prior judgment; (4) the parties must have actually litigated the issues and the resolution of these issues must have been essential to the prior decision; and (5) the controlling facts and applicable legal rules must remain unchanged. Peck v. Commissioner, supra at 166-167.

The Supreme Court has broadened the scope of collateral estoppel beyond its common-law limits by abandoning the requirement of mutuality of the parties, and has conditionally approved the "offensive" use of collateral estoppel by a plaintiff who was not a party to the prior lawsuit. See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 331 (1979). However, offensive use of collateral estoppel only applies when a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant previously litigated unsuccessfully in another action against the same or a different party. Id. at 326 n.4. Further, the Supreme Court subsequently held that nonmutual offensive collateral estoppel could not be applied to preclude

the Government's relitigation of the issue presented.  United States v. Mendoza, 464 U.S. 154, 159-164 (1984).

While some lower courts have indicated that the language in Mendoza is somewhat ambiguous, the Tax Court and the Court of Appeals for the Ninth Circuit, to which this case is appealable, have both on numerous occasions interpreted Mendoza as holding that nonmutual offensive collateral estoppel may not be invoked against the Government.  Natl. Med. Enter., Inc. v. Sullivan, 916 F.2d 542, 545 (9th Cir. 1990); Black Constr. Corp. v. INS, 746 F.2d 503, 504 (9th Cir. 1984); Kroh v. Commissioner, 98 T.C. 383, 402 (1992); McQuade v. Commissioner, 84 T.C. 137, 144 (1985); Barrett-Crofoot Invs. v. Commissioner, T.C. Memo. 1994-59.

### c.    Judicial Estoppel

Judicial estoppel is a doctrine that prevents parties in subsequent judicial proceedings from asserting positions contradictory to those they previously have affirmatively persuaded a court to accept.  United States ex rel. Am. Bank v. C.I.T. Constr., Inc., 944 F.2d 253, 257-259 (5th Cir. 1991); Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 598-599 (6th Cir. 1982).  The Tax Court, as well as the Courts of Appeals for the Ninth Circuit, have accepted the doctrine of judicial estoppel. See Helfand v. Gerson, 105 F.3d 530, 534 (9th Cir. 1997); Huddleston v. Commissioner, 100 T.C. 17, 28-29 (1993).

The doctrine of judicial estoppel focuses on the relationship between a party and the courts, and it seeks to protect the integrity of the judicial process by preventing a party from successfully asserting one position before a court and thereafter asserting a completely contradictory position before the same or another court merely because it is now in that party's interest to do so. Edwards v. Aetna Life Ins. Co., supra at 599; Huddleston v. Commissioner, supra at 26. Whether or not to apply the doctrine is within the court's sound discretion. It should be applied with caution in order "to avoid impinging on the truth-seeking function of the court because the doctrine precludes a contradictory position without examining the truth of either statement." Daugharty v. Commissioner, T.C. Memo. 1997-349 (quoting Teledyne Indus., Inc. v. NLRB, 911 F.2d 1214, 1218 (6th Cir. 1990)).

Because judicial estoppel focuses primarily on the relationship between a party and the courts, it is distinguishable from equitable estoppel, which focuses primarily on the relationship between the parties themselves. Teledyne Indus., Inc. v. NLRB, supra at 1219-1220. Judicial estoppel generally requires acceptance by a court of the prior position and does not require privity or detrimental reliance of the party seeking to invoke the doctrine. Id.; Huddleston v. Commissioner,

supra at 26.  Acceptance by a court does not require that the party being estopped prevailed in the prior proceeding with regard to the ultimate matter in dispute, but rather only that a particular position or argument asserted by the party in the prior proceeding was accepted by the court.  In re Cassidy, 892 F.2d 637, 641 (7th Cir. 1990); Edwards v. Aetna Life Ins. Co., supra at 599 n.5; Huddleston v. Commissioner, supra at 26.

Although judicial estoppel is somewhat similar to collateral estoppel, there are substantial differences between the two doctrines.  See Teledyne Indus., Inc. v. NLRB, supra at 1220.  Thus, judicial estoppel may apply in a case "where neither collateral estoppel nor equitable estoppel  *  *  *  would apply."  Allen v. Zurich Ins. Co., 667 F.2d 1162, 1166-1167 (4th Cir. 1982).

C.    Discussion of Partnership Level Theft Loss Deductions

    1.    Determination of Whether the Sheep Partnerships Were Victims of Theft

As previously stated, in order to sustain a theft loss deduction, petitioners must prove the following elements:  (1) That each sheep partnership was the victim of a theft pursuant to the law of the jurisdiction where the loss was sustained; (2) the year that each partnership discovered the loss from the theft; and (3) the amount of theft loss that each partnership suffered.  See Yates v. Commissioner, T.C. Memo. 1988-565.

        a.    The Occurrence of a Theft

Petitioners have the burden of establishing a theft of

partnership property from each of the sheep partnerships. Petitioners rely on Jay Hoyt's Federal conviction and three Oregon statutes that are similar to the Federal criminal statutes Jay Hoyt was convicted of violating as proof of the occurrence of a theft from the partnerships. On the premise that Jay Hoyt's conviction establishes a theft from the individual investors, petitioners claim that the partnerships were the victims of Jay Hoyt's theft, because "a theft from all the partners, is a theft from the partnerships." Finally, petitioners cite various cases for propositions that they assert establish a theft from the partnerships.

The Court is mindful that throughout all of petitioners' arguments dealing with a theft loss, they treat "partners" and "partnerships" as the same, making no clear distinction between these terms. As set forth infra pp. 51-55, a clear distinction exists under both California and Nevada law. Further, a distinction between partners and partnerships exists under Federal law. See sec. 6226.

Because all the partnerships at issue are subject to the provisions enacted in the Tax Equity & Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 402(a), 96 Stat. 648, our jurisdiction is limited exclusively to the determination of the tax treatment of partnership items for the partnership year to which the FPAA relates. See sec. 6226; infra pp. 108-109. We

have no jurisdiction in this partnership level proceeding over nonpartnership items, which can only be determined at the individual partner level. Affiliated Equip. Leasing II v. Commissioner, 97 T.C. 575, 576 (1991).

The Court shall not allow petitioners to freely interchange the partners with the partnerships to suit their arguments. Accordingly, when addressing the petitioners' theft loss arguments, the Court will apply the distinction between the partners and the partnerships as required by law.

(i)  Jay Hoyt's Conviction of Federal Crimes

On February 12, 2001, Jay Hoyt was convicted of 1 count of conspiracy to commit fraud, 31 counts of mail fraud, 3 counts of bankruptcy fraud, and 17 counts of money laundering. See United States v. Barnes, et al., No. CR-98-529-JO-04 (D. Or. Feb. 12, 2001). The indictment charged Jay Hoyt and others with conspiring to "defraud thousands of investors" by selling investment interests "by means of false promises and representations." The U.S. District Court described Jay Hoyt's crimes as "the most egregious white collar crime committed in the history of the State of Oregon." United States v. Hoyt, 47 Fed. Appx. 834, 836 (9th Cir. 2002). Jay Hoyt was ordered to pay restitution to each victim (investor-partner) in an amount equal to the total payments each individual made to the Hoyt organization.

Although Jay Hoyt's indictment dealt with fraud perpetrated against individual investors through the use of cattle partnerships only, the judgment ordered restitution to all the partners in the cattle and sheep partnerships. By definition, restitution is the "act of making good or giving equivalent for any loss, damage, or injury." Black's Law Dictionary 1180 (5th ed. 1979). Further, a general obligation exists for a person who defrauds another to make restitution to the person defrauded. Kreimer v. Commissioner, T.C. Memo. 1983-672. Accordingly, the U.S. District Court would not have ordered Jay Hoyt to pay restitution to the sheep partners had they not been victims of his crimes. Moreover, in Jay Hoyt's appeal of his conviction, he did not argue that the U.S. District Court erred by including the sheep partners in the restitution order. See United States v. Hoyt, supra.

Because the sheep partners were included in the restitution order and all the sheep partnerships were formed, organized, and operated in essentially the same fashion as the cattle partnerships, we conclude that Jay Hoyt defrauded the individual investors in the nine sheep partnerships in the same manner that he was convicted of defrauding the individual investors in the cattle partnerships.

Petitioners state that the "conviction established Hoyt's theft from all his partners and partnerships." Petitioners

assert that the indictment in the criminal case provides sufficient facts to establish the existence of a theft for purposes of a theft loss. As previously mentioned, under TEFRA we have no jurisdiction in this partnership level proceeding over nonpartnership items, which can only be determined at the individual partner level. See sec. 6226; <u>Affiliated Equip. Leasing II v. Commissioner</u>, <u>supra</u> at 576. Accordingly, we analyze each of the crimes Jay Hoyt was convicted of committing to determine whether the <u>partnerships</u> are entitled to a theft loss deduction.

Jay Hoyt was convicted of one count of conspiracy to commit mail fraud and multiple counts of mail fraud, but these criminal acts were perpetrated against prospective and current partners, not the partnerships. Nothing in the indictment indicates that the partnerships were the victims of the conspiracy or mail fraud committed by Jay Hoyt, nor was any restitution awarded to the partnerships. Clearly, the victims of these crimes for which Jay Hoyt was convicted and ordered to pay restitution were <u>exclusively</u> individual investors. Crimes perpetrated on the partnerships simply were not the nature or focus of the Federal conspiracy and mail fraud investigation and prosecution.

Jay Hoyt was convicted of 31 counts of mail fraud for using the USPS to execute his intentional scheme to defraud and to obtain money through false promises and false pretenses. Each of

the 31 counts corresponds to a particular mailing either sent by the Hoyt organization from Burns, Oregon, to a partner in one of the cattle partnerships or a check sent by a partner in one of the cattle partnerships to Burns, Oregon. These individual mailings collectively establish that the victims of the mail fraud were the individual cattle partners who received mailings from the Hoyt organization and sent checks to the Hoyt organization. For the sheep partnerships all to be victims of mail fraud, each partnership would have had to receive some mail from the Hoyt organization and then part with partnership property based on false promises and false pretenses contained within the mailing. No evidence was presented establishing that these events ever occurred. Further, as previously stated, the partnerships were not included in the indictment as victims of the mail fraud.

The indictment charged and the prosecution proved that Jay Hoyt and others made false representations and promises "to prospective investors and current investors in order to obtain money from them" using the "investors simply as sources of cash." The fraud was perpetrated on the investors; Jay Hoyt knew for many years he did not have the total amount of livestock that he claimed and could not meet the various guarantees he promised, yet he continued to create new partnerships and fictitious livestock as a scheme and artifice to defraud individuals. The

fact that Jay Hoyt used the partnerships as an integral part of perpetuating fraud against individual investors through false promises and false pretenses does not establish a theft on the partnership level.

Petitioners cannot rely on Jay Hoyt's conspiracy to commit fraud and mail fraud convictions to establish theft from the partnerships by inserting a different set of victims from those stated in the indictment and proven at the criminal trial. Because we determine that Jay Hoyt's fraud was perpetrated on the individual partners, we hold that his conviction for conspiracy to commit fraud and mail fraud does not establish that a partnership level theft occurred.

Petitioners make no mention of Jay Hoyt's conviction for bankruptcy fraud. As to this charge, Jay Hoyt was convicted of knowingly and fraudulently (1) concealing property from creditors, the U.S. Trustee, and other officers of the court, (2) making material false oaths, accounts, and testimony, and (3) making material false declarations, certificates, verifications, or statements under penalty of perjury. There is no evidence in the record that any of the property concealed was sheep partnership property. Petitioners do not specifically assert, the record does not contain evidence, nor do we find that the conviction for bankruptcy fraud establishes a theft on the sheep partnerships for any of the years at issue.

Jay Hoyt was also convicted of money laundering for concealing from the bankruptcy trustee over $1,600,000 in funds received from investors after June 5, 1997, that were deposited into First Security Bank and later withdrawn in varying increments. The 17 money laundering counts for which Jay Hoyt was convicted each represent individual checks drawn on the First Security Bank account that were each (1) made payable to Hoyt related partnerships or individuals, and (2) of a value greater than $10,000. The dates for each of these 17 checks range from on or about June 30, 1997, through January 15, 1998. Accordingly, the money laundering conviction, which was based on activities that commenced in 1997, cannot possibly be used as evidence to establish a theft prior to that date. Since 1996 is the last year at issue for all of the nine sheep partnerships, the money laundering conviction in no way establishes a theft from any of the sheep partnerships for any of the years at issue.

Rejecting the arguments advanced by petitioners, the Court holds that none of the Federal crimes committed by Jay Hoyt establish that a section 165 theft was perpetrated on the partnerships for any of the years at issue. Accordingly, a theft from each partnership of partnership property must be proven under another theory for petitioners to establish that the partnerships were the victims of theft.

(ii)  Petitioners' Claim That a Theft From the
Partners is a Theft From the Partnerships

Petitioners contend that even if the Court finds that Jay Hoyt's Federal conviction does not establish theft on the partnership level, at a minimum, the conviction establishes a theft from the partners.  Based on this contention and their assertion that the partners are synonymous with the partnerships, petitioners conclude that the partnerships sustained a theft. To reach this conclusion, petitioners argue that:  (1) Under State law, a partnership is its partners; (2) since the partnerships are aggregates of all the partners, and all the partners were defrauded, then the partnerships were defrauded; (3) stealing from partners by using the partnerships as the vehicle for fraud is indistinguishable from stealing from the partnerships; and (4) stealing from the partnerships is a theft from the partners because the partners jointly own the partnership assets.  Petitioners have failed to cite any authority supporting these arguments.

Petitioners state that the partnership law of Oregon, Nevada, and California arguably applies to the partnerships at issue.  However, only California and Nevada law applies, because eight of the sheep partnerships were formed under and governed by California law, with the remaining sheep partnership formed under and governed by Nevada law.

In particular, RCR #1, RCR #2, RCR #3, and RCR #4 were

formed in California as limited partnerships. RCR #5, RCR #6, OGT 87, and OGT 90 were formed in California as general partnerships, and RCR #7 was formed in Nevada as a general partnership.

Petitioners' argument that under State law a partnership is its partners provides no legal support for their conclusion that the partnerships were victims of theft. Under California limited partnership law, a limited partnership is a partnership formed by two or more persons under California law and having one or more general partners and one or more limited partners. Cal. Corp. Code secs. 15501, 15611(1) (West 1991 & Supp. 2002). Pursuant to California and Nevada general partnership law, a partnership is an association of two or more persons to carry on as co-owners a business for profit. Cal. Corp. Code sec. 15006(1); Nev. Rev. Stat. Ann. sec. 87.060 (Michie 1999 & Supp. 2001). It is obvious by definition that a partnership comprises of its partners. However, no conclusion can be drawn from this fact alone that a theft from the partners is a theft from the partnerships.

Petitioners' argument that the partnerships were defrauded because the partnerships are aggregates of all the partners who were defrauded is unsupported by California and Nevada law. This argument is a refined rendition of petitioners' first argument and is based on their conclusion that for all purposes a partnership is an aggregate of its individual partners.

The "aggregate theory" and the "entity theory" are two theories regarding the basic nature of a partnership. The aggregate theory considers a partnership to be no more than an aggregation of the individual partners. Whereas, the entity theory characterizes a partnership as a separate entity distinct from its partners. Whether the aggregate theory or the entity theory should be applied for all purposes has not ultimately been determined. Unger v. Commissioner, T.C. Memo. 1990-15, affd. 936 F.2d 1316 (D.C. Cir. 1991). The theory employed varies from case to case, often depending on the issue to be decided. Id.

Under the aggregate approach, each partner has an interest in specific partnership property. Unger v. Commissioner, 936 F.2d 1316, 1318 (D.C. Cir. 1991), affg. T.C. Memo. 1990-15. In contrast, under the entity approach, partnership property is attributable to the partnership only, not to the partners. Id.

The California and Nevada partnership law deals with partnerships as aggregates for certain purposes and as entities for others. The definition of a partnership as an "association of two or more persons" to carry on as co-owners a business for profit suggests that a partnership is an aggregate of its members. However, the fact that specific partnership property is a distinct category of property indicates the entity approach would apply to partnership assets. See Stilgenbaur v. United

States, 115 F.2d 283, 286 (9th Cir. 1940); State v. Elsbury, 63 Nev. 463, 467-468, 175 P.2d 430, 433 (1946).

The entity approach (as opposed to the aggregate approach) is in accord with the clear intent of the California and Nevada partnership law, that partnership property is a separate and distinct category of property. Accordingly, petitioners cannot apply the aggregate approach to conclude that the partnerships were defrauded.

Petitioners' argument that Jay Hoyt's use of the partnerships to perpetrate fraud on the partners is tantamount to stealing from the partnerships is without merit. The record establishes that Jay Hoyt defrauded the individual investors, not the partnerships, of their money. As previously mentioned, the fact that Jay Hoyt utilized the partnerships as a guise to defraud individuals does not establish a theft on the partnership level.

Petitioners' argument that the partners jointly own the partnership assets is unsupported by the law. Under California limited and general partnership law and Nevada general partnership law, a partner's interest in a partnership is personal property and the partner has no interest in specific partnership property. See Evans v. Galardi, 16 Cal. 3d 300, 307, 546 P.2d 313, 319 (1976); Stilgenbaur v. United States, supra at 286; State v. Elsbury, 63 Nev. at 467-468, 175 P.2d at 433.

Specific partnership property is a distinct category of property, separate from a partner's interest in the partnership. Stilgenbaur v. United States, supra. A partner's personal property interest in the partnership grants the partner a right to his share of profits and surplus, not an ownership interest to any particular portion of the partnership assets. Comstock v. Fiorella, 260 Cal. App. 2d 262, 265, 67 Cal. Rptr. 104, 106 (1968). Contrary to petitioners' assertion, under California and Nevada partnership law, the partners do not jointly own the partnership assets. Therefore, petitioners' argument fails to establish a theft on the partnership level.

The arguments presented by petitioners fail to recognize the legal distinction between a partnership and its partners. Thus their claim that a theft from the partners is a theft from the partnerships is without merit and unsupported by the law.

(iii) Petitioners' Claim That a Theft Occurred
Under State Law

Petitioners assert that Jay Hoyt's criminal acts, for which he was convicted under Federal law in Oregon, constitute theft under similar Oregon statutes. Namely, Oregon Revised Statutes (ORS): (1) Section 164.085, theft by deception; (2) section 164.170, laundering a monetary instrument; and (3) section 164.172, engaging in a financial transaction in property derived

from unlawful activity.[13] Petitioners rely exclusively on Jay Hoyt's Federal conviction in Oregon to establish the elements of a theft under State law. However, since we held above that petitioners cannot rely solely on Jay Hoyt's conviction to establish theft from the partnerships, petitioners must prove they were the victims of a theft under the applicable law of the jurisdiction where the alleged thefts occurred.

Petitioners state that they rely on the Oregon criminal statutes because Jay Hoyt was convicted of Federal crimes in Oregon and each partnership was formed and operated in Oregon. As we previously determined, the specific crimes Jay Hoyt was convicted of violating in Oregon were perpetrated against individual investors and were not thefts of partnership property. Further, petitioners' claim that the sheep partnerships were formed and operated in Oregon is factually incorrect. As previously discussed, eight of the sheep partnerships at issue were formed in California and one partnership was formed in Nevada.

Not only were a majority of the partnerships formed in California, but the record shows that the majority of sheep operations were performed in California. All of the agreements were entered into in California between California or Nevada partnerships and Barnes Ranch, a sole proprietorship operated in

---

[13] Or. Rev. Stat. secs. 164.170 and 164.172 (2001), are both money laundering statutes.

California.  The record establishes that any sheep that actually existed were located on Barnes Ranch in Sacramento, California. In addition, for all the years at issue, the record shows that the checks from individual sheep partners were received at the Elk Grove, California, office and deposited into the RCR account or the pooling account at the bank located in Elk Grove, California.

While the record contains evidence that money was deposited into bank accounts in California during the years at issue, no evidence was presented showing that the money ever left California.  There is no evidence in the record to establish that any of the investor funds were ever transferred to the Hoyt office in Burns, Oregon, or deposited into an Oregon bank account during any of the years at issue.  Further, petitioners failed to present any evidence that any partnership property was illegally taken from anywhere in Oregon during any of the years at issue.

Without any evidence to link the investor funds to Oregon, petitioners cannot possibly prove that Oregon is the jurisdiction where the alleged thefts occurred.  Therefore, due to the lack of evidence presented on this issue, petitioners have failed to establish that a theft of partnership property occurred within the State of Oregon during any of the years at issue.  However, in light of Jay Hoyt's criminal activities in Oregon, we shall analyze the three Oregon statutes cited by petitioners to

determine whether any illegal activity occurred in Oregon sufficient to establish petitioners were the victims of a theft.

We believe that petitioners equate the ORS section 164.085, theft by deception statute, to the Federal conspiracy to commit fraud and mail fraud statutes Jay Hoyt was convicted of violating.  To violate the Oregon theft by deception statute, a person, with intent to defraud, must obtain the property of another by:  (1) Creating or confirming another's false impression of law, value, intention or other state of mind which the actor does not believe to be true; (2) failing to correct a false impression which the person previously created or confirmed; (3) preventing another from acquiring information pertinent to the disposition of the property involved; (4) selling or otherwise transferring or encumbering property, failing to disclose a lien, adverse claim or other legal impediment to the enjoyment of the property; or (5) promising performance which the person does not intend to perform or knows will not be performed.  Therefore, to establish a theft under the Oregon statute cited by petitioners, they must prove that Jay Hoyt, with intent to defraud each partnership by means of at least one of the five methods stated in the theft by deception statute, deceptively obtained partnership property each year from each partnership equal to the amount of total cash the investors contributed in each of those years.

Petitioners state in their brief that the sheep partnerships entered into "transactions with Hoyt and Barnes upon having been deceived as to the transaction."[14] The record does not support petitioners' assertion that the partnerships were deceived in any way. Although Jay Hoyt and David Barnes did enter into various partnership agreements and transactions with the intent to deceive, the victims of their intentional deception were the individual investors, not the partnerships. Many of the documents created by the partnership transactions were merely instruments intentionally used to defraud individual investors by creating false impressions and making promises known not to be true.

As previously stated, petitioners readily admit that investors would not have parted with their money if not for Jay Hoyt's deceptive practices. Petitioners' admission further emphasizes that the thefts occurred when the individuals were deceived into parting with their money. The partnerships were not victims of those deceptive practices and were not deceived by those practices into parting with any partnership property. Petitioners fail to show how Jay Hoyt's theft by deception perpetrated against the individual partners constitutes a theft of partnership property under the law of Oregon.

---

[14] Statements in a brief that are not supported by testimony or documents introduced at trial are not evidence. See Rule 143(b); Niedringhaus v. Commissioner, 99 T.C. 202, 217 n.7 (1992).

The record is void of any evidence to establish that Jay Hoyt or anyone else violated the Oregon theft by deception statute with respect to the partnerships. Accordingly, petitioners have not met their burden of establishing a theft on the partnership level for section 165 purposes applying the Oregon theft by deception statute.

Petitioners also cite the Oregon money laundering statutes, Or. Rev. Stat. secs. 164.170 and 164.172 (2001), as establishing a theft from the partnerships. Other than providing evidence of Jay Hoyt's conviction for violation of a similar Federal statute, petitioners fail to present any evidence showing how the Oregon statutes establish a theft on the sheep partnerships.

Petitioners have not provided evidence that Jay Hoyt or anyone else conducted a financial transaction with proceeds of an unlawful activity of a sum equal to the total amount invested by the partners in each of the years at issue. Unlike the indictment and evidence presented at Jay Hoyt's Federal criminal trial, petitioners failed to present any evidence that Jay Hoyt or anyone else during any of the years at issue knowingly engaged in a financial transaction in Oregon of a value greater than $10,000 in property using the proceeds of any unlawful activity.

Additionally, both of the Oregon money laundering statutes require proof that an underlying unlawful activity was committed to obtain the proceeds involved in the financial transaction.

Yet, petitioners did not specify which alleged unlawful activity was committed to obtain the proceeds.

Jay Hoyt's indictment specifically stated the underlying unlawful activity committed in Oregon and presented 17 specific monetary transactions (negotiated checks) constituting money laundering.[15]  Because those checks bore dates in 1997 or 1998, each check was negotiated after the tax years here at issue.  See supra p. 50.  Petitioners did not introduce any checks or similar evidence of any monetary transactions that were negotiated during any of the years at issue.

Petitioners have not proven that any of the partnerships were victimized during the years at issue by a violation of either of the Oregon money laundering statutes.  Petitioners failed to present any evidence proving the elements of either crime.  Thus, by merely citing the two Oregon money laundering statutes and not proving the elements of those crimes, petitioners have not established a theft on the partnership level for any of the years at issue.

(iv)  Analysis of Case Law Cited by Petitioners

We now address the following cases which petitioners rely upon as authority to support their various arguments that the sheep partnerships are entitled to a theft loss deduction.

---

[15]  The specified unlawful activities used to establish money laundering at Jay Hoyt's criminal trial were mail fraud and bankruptcy fraud.

Petitioners cite: (1) <u>Nichols v. Commissioner</u>, 43 T.C. 842 (1965), for the general proposition that the "partnerships are entitled to a theft loss deduction" because a "promoter's fraud in obtaining money from investors in a tax shelter constitutes theft under Section 165"; (2) <u>Cummin v. United States</u>, 73 AFTR 2d 2092 (D.N.J. 1994), for the propositions that (a) "the partnerships are entitled to a business theft loss" where the partnerships' transactions lack "economic substance by reason of fraud", and (b) "the Tax Court has contemplated there will be circumstances where a partner's out-of-pocket loss in a tax shelter is deductible as a theft loss"; and (3) <u>Girgis v. Commissioner</u>, T.C. Memo. 1987-556, affd. in part, revd. in part, and remanded 888 F.2d 1386 (4th Cir. 1989), and <u>Harrell v. Commissioner</u>, T.C. Memo. 1978-211, for the proposition that if it is proven that "the money invested by a partner in a partnership is lost to another partner's theft of the same, the partnership has incurred a loss."

Petitioners' reliance on <u>Nichols v. Commissioner</u>, <u>supra</u>, is misplaced. <u>Nichols</u> is distinguishable from the instant cases and is not persuasive in establishing that a theft loss occurred at the partnership level.

The taxpayers in <u>Nichols</u> were individuals who invested in a tax shelter and proved that the promoter of the investment did not execute the transactions for which the investors bargained.

In <u>Nichols</u>, the taxpayers alleged and proved numerous fraudulent misrepresentations by the promoter which induced the individuals to part with their money and which constituted theft under applicable State and Federal law.

Although Jay Hoyt committed acts similar to the promoter in <u>Nichols</u>, the critical difference is that <u>Nichols</u> was a deficiency suit in which the petitioners were individual investors who established they were the victims of a theft of their own out-of-pocket expenditures. By contrast, the instant case is a TEFRA proceeding brought on behalf of the partnerships seeking to deduct as a theft loss from the partnerships the total amount of cash fraudulently obtained from the investors.

As previously discussed, a theft from the partners is not a theft from the partnerships, and <u>Nichols</u> cannot be cited as authority to make this leap. The individual investors in <u>Nichols</u> were allowed a theft loss deduction solely because they met all the required elements of section 165. <u>Nichols</u> certainly does not hold that a partnership is entitled to a theft loss deduction when the individual investors are swindled by the promoter's fraud.

Likewise, the unpublished opinion in <u>Cummin v. United States</u>, <u>supra</u>, does not support petitioners' conclusion that the sheep partnerships are entitled to a theft loss deduction.

As in <u>Nichols</u>, at issue in <u>Cummin</u> were theft loss deductions of individual investors, not of partnerships.  Exclusively analyzing a theft loss on the individual investor level, <u>Cummin</u> never addresses the issue of a partnership level theft loss deduction.  We agree with respondent and find that <u>Cummin</u> simply is not authority for petitioners' proposition that "the partnerships are entitled to a business theft loss."

In their reply brief, petitioners claim that they cited <u>Cummin</u> for the proposition that "the Tax Court has contemplated there will be circumstances where a partner's out-of-pocket loss in a tax shelter is deductible as a theft loss."  This later proposition adds nothing to petitioners' arguments and is not authority to allow a partnership level deduction where the individual partners are swindled.

Finally, petitioners argue that both <u>Girgis v. Commissioner</u>, T.C. Memo. 1987-556, and <u>Harrell v. Commissioner</u>, T.C. Memo. 1978-211, stand for the proposition that a partnership level loss is incurred when money invested by a partner in a partnership is taken by another partner.  While both of these cases deal with claims to partnership level losses, neither case stands for the proposition set forth by petitioners.  Further, the facts in both of these cases are distinguishable from the facts in the instant case because:  (1) The theft by the partner in <u>Girgis</u> was an embezzlement of partnership receipts and not of money invested by

a partner; (2) the taxpayer in Harrell failed to prove that his partner embezzled any partnership funds, so the Court allowed the taxpayer an ordinary loss, not a theft loss, for his distributive share of partnership loss in an amount equal to his investment because all partnership assets had been irretrievably lost; and (3) neither of the partners in Girqis or Harrell was fraudulently induced into investing or becoming a partner in his respective partnership.

Both Girqis and Harrell indicate that a partner's embezzlement of partnership funds gives rise to a partnership level deduction. Embezzlement of funds from the sheep partnerships, if proven, could be a theft within the purview of section 165 for which the partnerships would be entitled a deduction. See Marine v. Commissioner, 92 T.C. 958, 976-977 (1989). However, petitioners in the instant case have failed to prove that an embezzlement of partnership property occurred during any of the years in issue. Jay Hoyt was never charged with such an embezzlement, and the record does not support such a finding. Neither Girqis or Harrell supports petitioners' argument that the sheep partnerships are entitled to theft loss deductions for any of the years at issue.

b.    The Year of Discovery Requirement

The year of discovery requirement would be relevant in this case only if the petitioners had established a theft loss at the

partnership level, which they have not. Assuming, arguendo, that petitioners had proven that the partnerships were the victims of a partnership level theft, petitioners still failed to satisfy the year of discovery element required to claim a theft loss deduction.

Petitioners acknowledge that pursuant to section 165(e), a taxpayer may deduct a theft loss only in the tax year in which the taxpayer discovers the loss. Further, petitioners concede that the partnerships' discovery of the alleged thefts occurred in 1997 or 1998, which is after the last year at issue in this case. However, petitioners assert that respondent is equitably estopped from denying the theft loss deduction in each of the years at issue regardless of the actual year of discovery. In addition, petitioners argue that under Rod Warren Ink v. Commissioner, 912 F.2d 325 (9th Cir. 1990), this Court "may depart from the literal meaning of [section 165(e)] regarding the year of discovery in order to avoid unintended negative consequences to the taxpayer and to effectuate Congress' intent."

Petitioners' sole purpose in seeking a deviation from the discovery date requirements of section 165(e) to deduct the theft losses in each of the years at issue is to distribute losses from the partnerships to the individual partners, thereby reducing the amount of interest partners owe on deficiencies related to the TEFRA partnership adjustments.

(i)  Application of Equitable Estoppel

Petitioners argue that the doctrine of equitable estoppel precludes respondent from relying on section 165(e) as a basis for disallowing their claims to theft loss deductions. Specifically, petitioners argue that respondent's actions and inactions in the course of auditing all the Hoyt organization partnerships since the early 1980s resulted in the concealment of material evidence from the partnerships and misleading silence to the partnerships. They claim that through the audit process respondent obtained information of Jay Hoyt's fraud, yet failed to timely inform them of this fraudulent activity. Further, they allege that they relied to their detriment on respondent's concealment or misleading silence relating to the fraud.

As a threshold matter, petitioners must prove affirmative misconduct by the Government in addition to the traditional elements of equitable estoppel. See Purcell v. United States, 1 F.3d 932, 939 (9th Cir. 1993). Petitioners have failed to show the traditional elements of equitable estoppel, much less affirmative misconduct by respondent. They presented no evidence of ongoing active misrepresentations or a pervasive pattern of false promises by respondent. Having failed to show affirmative misconduct by the Government, we conclude that petitioners cannot assert equitable estoppel against respondent to deviate from the year of discovery requirement in section 165(e).

And, contrary to petitioners' assertion that the traditional elements of equitable estoppel have been met, thus warranting a departure from the year of discovery requirement in section 165(e), the record reflects that respondent did not misrepresent or conceal from the partnerships or the partners any material facts obtained in the audits. Respondent audited the various partnerships from 1984 through 1996, and reported its findings to the partnerships and partners. Respondent issued all notices of beginning of administrative proceeding, FPAAs, and prefiling notices in a timely manner in accordance with the Internal Revenue Code. According to petitioners, respondent "advised the partners that their partnerships were being audited and adjusted, because [respondent] determined the partnerships were shams and constituted improper tax shelters."

Petitioners, nonetheless, fault respondent for not doing more to stop the fraud perpetrated by Jay Hoyt. They assert that respondent, well before 1993, should have acted more effectively to protect the partners and prospective investors from Jay Hoyt's fraudulent activities. Our review of the record discloses the substantial difficulties that respondent encountered in obtaining a sufficient amount of information to conclude the existence of a fraud prior to 1993.

By the early 1980s, respondent generally disallowed the tax benefits the cattle and sheep partnerships and their partners

claimed.  Further, respondent engaged in almost continuous and protracted litigation with the partnerships and partners over the disallowance of partnership tax benefits.  However, the decision in Bales v. Commissioner, T.C. Memo. 1989-568, set back respondent's efforts, as the decision rejected respondent's economic sham theory and allowed the Bales partners many of their claimed tax benefits.

Although in 1989, respondent suspected that Jay Hoyt had been selling a large number of fictitious cattle to the cattle partnerships, the evidence respondent possessed at that time did not confirm this suspicion.  As a result, respondent decided that during the examination of the post-1986 cattle and sheep partnership returns, a count and inspection of all the cattle and sheep were essential.  From the fall 1992 through spring 1993 livestock count and inspection, respondent determined that the Hoyt organization had greatly overstated the number and value of the livestock owned by the partnerships.  As a result of the count and inspection, respondent believed by February 1993 that he possessed sufficient evidence to support the issuance of prefiling notices and freezing tax refunds claimed by partners.

Following the respondent's issuance of prefiling notices to the partners in February 1993, and the completion of the count and inspection of the cattle and sheep, the Examination Division on or about December 30, 1993, issued letters to all the partners

in which it warned them that IRS personnel had concluded and determined that: (1) A number of fictitious breeding cattle and sheep had been sold to the Hoyt cattle and sheep partnerships; and (2) Jay Hoyt and the Hoyt organization had overstated both the numbers and value of the purported livestock that the partnerships allegedly owned.

In the Examination Division letter sent to each partner, respondent specifically informed the partners of the problems that respondent had uncovered in the Hoyt organization's tax shelter program as a result of the respondent's count and inspection of the cattle and sheep. The letter provided the partners with sufficient information to place them on notice that fraudulent activity might be taking place. By providing the partners with their findings, respondent discharged any duty it arguably had to the partnerships and partners, as it was then up to them to decide whether to take advantage of this information.[16] E.g., Wintner v. Commissioner, T.C. Memo. 1977-144 (noting that IRS agents had told the taxpayer or put the taxpayer on notice about the irregularities the agents had uncovered in examining the books and records of the taxpayer's business; concluding further that having provided the taxpayer

_____

[16] Certainly by 1993, the partners also knew or should have known that the IRS might: (1) Disallow the tax benefits that the Hoyt cattle and sheep partnerships and their partners claimed; and (2) attempt to uphold such disallowances and partnership adjustments in any tax litigation that the partnerships and partners commenced.

with this information, the agents discharged any duty they owed the taxpayer and did not misrepresent or conceal any material facts concerning the embezzlement by the taxpayer's employee).

Notwithstanding their receipt of the December 30, 1993, Examination Division letter, the record reflects that many partners instead chose to ignore the evidence and believe Jay Hoyt. While believing Jay Hoyt may have ultimately been to their detriment, the partners' decision to do so and the failure of them and the partnerships to discover any of the theft losses during the years in issue was not due to a false representation or misleading silence by respondent.

Petitioners' argument is based on the perspective of the individual partners, not the partnerships. The party claiming equitable estoppel must be the party that relied on the Government's representations and suffered a detriment because of that reliance. Norfolk S. Corp. v. Commissioner, 104 T.C. 13, 60 (1995), affd. 140 F.3d 240 (4th Cir. 1998). Here the petitioners claim that the partnerships relied on respondent's concealment and silence to the partnerships' detriment, then argue that the partners could not have discovered the loss on their own, but relied on respondent to take action against Jay Hoyt. To meet the elements of equitable estoppel, petitioners must establish that the partnerships suffered to their detriment, not the partners.

As previously discussed, the partnerships and the partners

are separate and distinct.  By arguing that the partners and not the partnerships suffered to their detriment, petitioners have not met a required element of equitable estoppel.  Accordingly, petitioners may not apply equitable estoppel to depart from the section 165(e) year of discovery requirement.

(ii)  Application of the Rod Warren Ink Case

Citing Rod Warren Ink v. Commissioner, 912 F.2d 325 (9th Cir. 1990), petitioners argue that the sheep partnerships may deduct theft losses in each year of occurrence rather than in the year of discovery by the partnerships.

In Rod Warren Ink, the Court of Appeals for the Ninth Circuit held that the personal holding company (PHC) therein could deduct theft losses in the years the losses were sustained, rather than in the year the losses were discovered.  Id. at 327-328.

Due to the unique interaction between section 165(e) and the PHC tax scheme, a literal application of section 165(e) would have forced the PHC in Rod Warren Ink to declare income it never actually received, while preventing the PHC from offsetting this income through appropriate loss deductions.  Id. at 328.  Limiting its holding to the "unique factual pattern" and "peculiar facts" presented in the case, id., the Court of Appeals for the Ninth Circuit concluded that a departure from the literal meaning of section 165(e) was warranted in order to avoid the

absurd tax result stated above and to effectuate Congress' intent to provide relief to taxpayers victimized by theft or embezzlement. Id. at 327. The Court of Appeals determined that "Forcing the taxpayer to report the loss only in the year of discovery for PHC purposes is contrary to the purposes and spirt of both section 165(e) and the PHC tax scheme," id. at 327, and that "a literal application of section 165(e) would unduly penalize the taxpayer." Id. at 328. The Court of Appeals went on to state that "Clearly, Congress did not intend for section 165(e) and the PHC tax scheme to function in such an inequitable and absurd manner." Id.

Petitioners' reliance on Rod Warren Ink is misplaced. The unique facts in Rod Warren Ink are distinguishable from the facts in the instant case.

A major distinction between Rod Warren Ink and the instant case is that the sheep partnerships are not personal holding companies. See Willoughby v. Commissioner, T.C. Memo. 1994-398.

In addition, petitioners have not presented a persuasive argument that a departure from the literal meaning of section 165(e) is warranted in order to avoid an "inequitable and absurd" result. Petitioners assert that an absurd tax consequence will result if the year of discovery requirement under section 165(e) is applied, because the partnerships' inability to discover Jay Hoyt's fraud at a sooner date caused the partners to accrue

additional interest on the disallowed partnership tax benefits they claimed.

For all the years at issue, the sheep partnerships distributed substantial tax benefits to the sheep partners under Jay Hoyt's and the Hoyt organization's tax shelter program. Up until the time the amended petitions were filed in the instant case following the River City Ranches #4, J.V. v. Commissioner, T.C. Memo. 1999-209, test case opinion in June 1999, the TMP maintained that the sheep partnerships were entitled to the tax benefits reported on the partnership tax returns. From 1993 through 1999, the sheep partners chose to await the outcome of the Tax Court litigation between respondent and their partnerships, undoubtedly hoping that this litigation would validate their entitlement to their claimed partnership tax benefits. Yet, these partners also knew or should have known that if respondent's position in this litigation was upheld, the Internal Revenue Code requires interest to be imposed on their resulting income tax underpayments. See Niedringhaus v. Commissioner, 99 T.C. 202, 222 (1992)("As a general rule, taxpayers are charged with knowledge of the law.").

Petitioners' argument is in no way analogous to the "inequitable and absurd" result in Rod Warren Ink, where the PHC would have been required to declare income it never actually received if not for the departure from section 165(e). In the

instant case, if the alleged theft losses were proven and claimed in the year of discovery, the partnerships would not have to declare income in a previous year that was never actually received. Petitioners are not seeking a departure from the year of discovery requirement to rectify a situation where section 165(e) operates in an "inequitable and absurd" manner that would unduly penalize the partnerships; petitioners merely are attempting to reduce the amount of interest the partners, who are not parties in this case, owe on tax underpayments.

A departure from the literal meaning of section 165(e) is not warranted in the instant case to implement Congress' intent. Congress enacted section 165 to provide relief to taxpayers victimized by theft or embezzlement. In Rod Warren Ink, the literal application of section 165(e) would have subverted the intent of Congress by allowing a theft loss deduction in the year of discovery, but, at the same time, creating taxable income in previous years. If petitioners were entitled to a theft loss deduction, claiming that deduction in the year of discovery[17] would provide relief from the thefts in the discovery year and not unduly penalize the partnerships in any previous years.

By the partnerships strictly following the application of section 165(e), the sheep partners would not receive the relief from interest which petitioners seek for them. However, the

---

[17] Petitioners concede that the alleged thefts were discovered at the earliest in 1997. See supra p. 66.

partnerships would receive the relief from theft intended by Congress. The facts in the instant case are clearly distinguishable from the unique facts in Rod Warren Ink and do not warrant a departure from the year of discovery requirement under section 165(e).

### (iii) Petitioners' Year of Discovery Claim

We have decided that equitable estoppel and the holding in Rod Warren Ink v. Commissioner, supra, have no application in this case. Thus, petitioners have failed to establish that a departure from the literal meaning of section 165(e) is warranted to allow the partnerships to claim theft loss deductions in any of the years at issue. Accordingly, a theft loss deduction, if proven, would only be allowed in the year of discovery. See sec. 165(e). Because petitioners admit that the partnerships did not discover the alleged theft losses until 1997 or 1998, the year of discovery requirement in section 165(e) precludes a theft loss deduction in any of the years at issue. See sec. 6226.

### c. The Remaining Elements of a Theft Loss

Although failure to prove only one of the elements of a theft loss prohibits a taxpayer from claiming the deduction, petitioners have failed to establish two essential elements of a theft loss deduction. Namely, (1) that the partnerships were victims of theft and (2) that the year of discovery was a year before the Court. Since we have held that the partnerships are

not entitled to a theft loss deduction for any of the years at issue, the petitioners' arguments concerning the remaining elements of a theft loss are moot.

2.    Application of Collateral and Judicial Estoppel

To further support their position, petitioners argue that both collateral and judicial estoppel preclude respondent from denying that Jay Hoyt's conviction establishes a theft from the partnerships and that the amount of the theft is equal to the total amount contributed by the partners.  Petitioners allege that Jay Hoyt's conviction establishes a theft from the partnerships and that the respondent cannot deny what the Government has already proven.

a.    Collateral Estoppel

Petitioners attempt to utilize offensive collateral estoppel against respondent.  Procedurally, in order for a plaintiff to assert offensive collateral estoppel against a defendant in a current action, the current defendant must have unsuccessfully litigated the issue in a previous action.  See Kroh v. Commissioner, 98 T.C. 383, 402 n.8 (1992)(citing Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.4 (1979)).  Here, petitioners seek to apply the offensive form of collateral estoppel in a situation where the Government was successful in the previous action.  Petitioners state that this is quite a rare situation, but that no logical reason exists to preclude the application of

offensive collateral estoppel when the current defendant was previously successful. Petitioners freely admit that they found no case law allowing for such an application. Additionally, petitioners have not presented a persuasive argument or sufficient rationale for this Court to adopt a use of offensive collateral estoppel, which is the antithesis of that determined by the Supreme Court of the United States in Parklane Hosiery Co. v. Shore, supra. As the Government was successful in the previous action against Jay Hoyt, petitioners are precluded from asserting offensive collateral estoppel against respondent.

Further, petitioners seek to apply the nonmutual form of offensive collateral estoppel against respondent to establish the existence of a theft from the partnerships. Petitioners claim that language in United States v. Mendoza, 464 U.S. 154 (1984), allows nonmutual offensive collateral estoppel in certain situations.

Petitioners assert, yet present no authority, that Mendoza has been limited by some courts "to situations where the policy concerns of the Court exist." Petitioners cite, exempli gratia, NLRB v. Donna Lee Sportswear Co., 836 F.2d 31 (1st Cir. 1987), for the proposition that "Mendoza has been limited in application to require mutuality only where important issues of law are at stake." However, petitioners fail to cite the many cases from this Court and the Court of Appeals for the Ninth Circuit,

wherein an appeal in the instant case would lie, which support a quite different interpretation of Mendoza.

Contrary to petitioners' construction of Mendoza, this Court and the Court of Appeals for the Ninth Circuit have both on numerous occasions interpreted Mendoza as holding that nonmutual offensive collateral estoppel may not be invoked against the Government.  See Natl. Med. Enter., Inc. v. Sullivan, 916 F.2d 542, 545 (9th Cir. 1990); Black Constr. Corp. v. INS, 746 F.2d 503, 504 (9th Cir. 1984); Kroh v. Commissioner, supra at 402; McQuade v. Commissioner, 84 T.C. 137, 144 (1985); Barrett-Crofoot Invs. v. Commissioner, T.C. Memo. 1994-59.  Accordingly, we follow these cases and hold that petitioners may not invoke nonmutual offensive collateral estoppel against respondent.

Assuming, arguendo, that in some circumstances nonmutual offensive collateral estoppel could be applied against respondent, petitioners failed to show that all the conditions for application of collateral estoppel have been met.  See Peck v. Commissioner, 90 T.C. 162, 166-167 (1988).  Specifically, petitioners have not presented a persuasive argument that the issue in the instant cases is "identical in all respects" with an issue decided in Jay Hoyt's criminal trial.  Id. at 166.

Petitioners claim that respondent is estopped from relitigating a theft from the partnerships, because Jay Hoyt was "convicted of stealing all the money contributed to the

partnerships by all the partners." Petitioners' statement is factually misleading. As previously addressed, Jay Hoyt was convicted of defrauding the individual investors, not the partnerships. Furthermore, Jay Hoyt's theft from the individual partners was not ipso facto a theft from the partnerships.

The issue presented in Jay Hoyt's criminal prosecution was whether he conspired to "defraud thousands of investors." There is no dispute that the individual investors were defrauded of some or all of the money they contributed. However, Jay Hoyt was not charged with any crime against the sheep partnerships. The issue in the instant cases is whether a "theft" occurred from the nine sheep partnerships. The issue of thefts from the sheep partnerships involved herein is not identical to an issue litigated and decided in Jay Hoyt's criminal trial. The two issues are separate and distinct. Therefore, petitioners have failed to satisfy the first condition required under Peck to apply collateral estoppel. Consequently, we need not address the remaining Peck conditions of collateral estoppel.

For the reasons stated above, petitioners are precluded from asserting collateral estoppel against respondent with respect to the issue of a theft from the sheep partnerships for any of the years at issue.

b.      Judicial Estoppel

Petitioners assert that judicial estoppel should apply

because respondent has taken "clearly inconsistent" positions from those taken in the criminal prosecution of Jay Hoyt. Petitioners assert that while the total amount of restitution ordered in the judgment against Jay Hoyt establishes the amount of the theft, respondent takes the position that petitioners have not proven the amount of theft for the years at issue. Further, petitioners claim that respondent should not be allowed to contest that Jay Hoyt is "guilty of fraud on a massive scale". According to petitioners, the "integrity of the judicial process would suffer if the IRS were allowed to make the absurd claim that Hoyt did not defraud petitioners."

The Court is not persuaded that respondent has taken any inconsistent positions with respect to the conviction of Jay Hoyt. As previously stated throughout this opinion, petitioners have failed to establish that they were defrauded of the amounts alleged as theft losses. Further, Jay Hoyt's conviction does not establish thefts from the partnerships for any of the years at issue. Respondent does not argue that Jay Hoyt is innocent of fraud in inducing the investors to contribute cash to the partnerships; respondent instead takes the position that the partnerships were not the victims of that fraud. Respondent's position is consistent with that of the Government in the criminal prosecution of Jay Hoyt, that the victims of his fraud were the individual investors.

Petitioners have failed to establish the elements necessary to assert judicial estoppel against respondent. Therefore, judicial estoppel cannot be utilized to prevent respondent from disputing petitioners' claim of the existence and amount of the thefts from the partnerships.

D. Conclusion

This Court is well aware of Jay Hoyt's criminal activities and the harm he has caused to thousands of individuals. Further, we sympathize with those that were defrauded by Jay Hoyt's deceptive practices. However, petitioners did not introduce any evidence at trial which would support a finding that a theft loss occurred on the partnership level during each of the years at issue. Petitioners have not met the elements required to sustain a section 165 theft loss deduction. Accordingly, we hold that petitioners have failed to establish that the nine sheep partnerships are entitled to theft loss deductions in any of the years at issue.

Issue 2. Expiration of the Period of Limitations

A. The Parties' Arguments

1. Petitioners' Arguments

In their amended petitions, petitioners specifically pleaded that the period of limitations had expired for each of the years at issue. On brief, petitioners now assert that the period of limitations has expired only with respect to the following

partnership taxable years: (1) For RCR #2, 1987; (2) for RCR #3, 1987 and its year ended September 30, 1989; (3) for RCR #4, 1984; (4) for RCR #5, 1987 and 1988, and its year ended September 30, 1989; (5) for RCR #7, 1987 and 1988, and its year ended September 30, 1989.

On April 23, 2001, respondent filed a motion for partial summary judgment that the applicable period of limitations with respect to 1984 for RCR #4 had not expired in docket No. 14038-96. After petitioners filed an objection to that motion on June 13, 2001, and upon hearing from the parties on the motion during the trial in the instant case, the Court took respondent's motion under advisement.

Petitioners contend that section 6231(c) and section 301.6231(c)-5T, Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6793 (Mar. 5, 1987), taken together, require the IRS, upon commencement of a criminal tax investigation of any TMP, to immediately remove that individual as TMP by issuing written notice that the IRS would treat the removed TMP's partnership items as nonpartnership items. According to petitioners, the first sentence of section 301.6231(c)-5T, Temporary Proced. & Admin. Regs., supra, expressly provides that, whenever any TMP is under criminal tax investigation, the continued treatment of that TMP's items as partnership items always will interfere with the effective and efficient enforcement of the revenue laws. Unlike

Phillips v. Commissioner, 114 T.C. 115 (2000), affd. 272 F.3d 1172 (9th Cir. 2001), petitioners are not claiming that section 301.6231(c)-5T, Temporary Proced. & Admin. Regs., supra, in whole or part, is invalid or that the IRS abused its discretion in failing to issue Jay Hoyt (the TMP) the notice that it would treat his items as nonpartnership items. Petitioners simply argue that the temporary regulation in question is mandatory and not discretionary.

Alternatively, petitioners argue that Jay Hoyt, as the TMP, could not bind the partners of the partnership because he suffered from numerous disabling conflicts of interest and could not properly represent the interests of the partners. Petitioners maintain that Jay Hoyt's disabling conflicts of interest bring the instant case squarely within the Court of Appeals for the Second Circuit's holding in Transpac Drilling Venture 1982-12 v. Commissioner, 147 F.3d 221 (2d Cir. 1998), revg. and remanding T.C. Memo. 1994-26.

Petitioners maintain that these alleged disabling conflicts of interest on the part of Jay Hoyt involved other conflicts besides the criminal tax investigations. Petitioners allege that these other conflicts include Jay Hoyt's: (1) Perpetrating an ongoing fraud upon the partners by misrepresenting the numbers and values of their livestock, while purporting to act as the partners' fiduciary; (2) diverting partner contributions to his

other businesses and properties; (3) participation on both sides of the livestock sales that the Hoyt organization made to the partnerships; (4) negotiation of tax issues with the IRS where the interests of the Hoyt family and the Hoyt organization conflicted with the interests of the Hoyt cattle and sheep partnerships and their partners; (5) commingling of partnership payments and failing to account for his and the Hoyt organization's use of those funds; (6) incentive to make concessions to the IRS, while under criminal investigation, that were harmful to the partners in order to have the IRS abate certain tax return preparer penalties that the IRS had assessed against him; (7) failure to file the partnership returns timely, thereby incurring late filing penalties; and (8) failure, during 1986, to either (a) inform the partners that he was under criminal investigation by the IRS, or (b) withdraw from his fiduciary roles on behalf of the partners.

    2.    Respondent's Arguments

    Respondent contends that the periods of limitations applicable to the partnership years in question have not expired, because the extension agreements that Jay Hoyt (the TMP) and the IRS executed are valid and binding upon the partners.  Respondent asserts that Phillips v. Commissioner, supra, largely controls the resolution of the limitations issue raised by petitioners in the instant case.  Specifically, respondent notes that in

Phillips, this Court and the Court of Appeals for the Ninth Circuit both rejected the taxpayer-partner's argument that section 301.6231(c)-5T, Temporary Proced. & Admin. Regs., supra, should be construed to require, whenever a criminal tax investigation of a TMP of a partnership is commenced, that the IRS automatically remove that individual as TMP.

Respondent further argues that the rationale employed by the Court of Appeals for the Second Circuit in Transpac Drilling Venture 1982-12 v. Commissioner, supra, is not applicable here, because the facts of the instant case, like Phillips, are distinguishable from those of Transpac. Respondent asserts that there is no evidence that Jay Hoyt (the TMP), in executing the extensions, had a disabling conflict of interest as a result of a criminal tax investigation and was seeking to ingratiate himself or curry favor with the IRS in exchange for lenient treatment relating to the criminal investigation.

Respondent maintains that to the extent other partnership conflicts between Jay Hoyt and the partners existed, those conflicts were of Jay Hoyt's making, not due to IRS action or inaction. Further, respondent asserts that the IRS was not a party to the dealings between Jay Hoyt and the sheep partners which created these alleged conflicts of interest, nor was the IRS involved in concealing Jay Hoyt's fraud upon the partners or responsible for his failures.

B.    Discussion of Applicable Law

The TMP is the central figure of partnership proceedings and his status is of critical importance to the proper functioning of the partnership audit and litigation procedures of secs. 6221-6233.  Phillips v. Commissioner, 114 T.C. at 120-121; Computer Programs Lambda, Ltd. v. Commissioner, 89 T.C. 198, 205 (1987).

Generally, there is a 3-year period of limitations on the assessment of a tax attributable to any partnership item.  Sec. 6229(a).  And, generally, the issuance of an FPAA will suspend the period of limitations, e.g., sec. 6229(d).  The TMP (or any other person authorized by the partnership in writing to enter into such an agreement), however, may extend the period of limitations on assessment with respect to all partners in a partnership by entering into an extension agreement with the IRS before the expiration of the limitation period.  Sec. 6229(b)(1)(B).[18]

A TMP is generally designated at the time the partnership return is filed.  See sec. 301.6231(a)(7)-1T(c), Temporary Proced. & Admin. Regs, 52 Fed. Reg. 6791 (Mar. 5, 1987).[19]  The

---

[18]   The period of limitations for a specific partner may also be extended by an agreement between the IRS and that partner.  See sec. 6229(b)(1)(A).

[19]   Temporary regulations under sec. 6231 concerning the designation, selection and termination of a TMP were issued in 1984 and 1987, and generally applied to all partnership taxable years beginning after Sept. 3, 1982.  Virtually identical provisions are made by the final regulation sec. 301.6231(a)(7)-
                                                              (continued...)

designation of a TMP remains effective until the termination of

that designation pursuant to section 301.6231(a)(7)-1(1)T,

Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6792 (Mar. 5,

1987), which provides in pertinent part:

(l) Termination of designation.  A designation of a
tax matters partner for a taxable year under this
section shall remain in effect until–

*       *       *       *       *       *       *

(4) The partnership items of the tax matters partner
become nonpartnership items under section 6231(c)
(relating to special enforcement areas), * * *

*       *       *       *       *       *       *

The termination of the designation of a partner as the
tax matters partner under this paragraph (l) does not
affect the validity of any action taken by that partner
as tax matters partner before the designation is
terminated.  For example, if that tax matters partner
had previously consented to an extension of the period
for assessments under section 6229(b)(1)(B), that
extension remains valid even after termination of the
designation.

In turn, section 6231(c), relating to special enforcement areas,

applies to criminal investigations that the Secretary determines

by regulation to present special enforcement considerations.

Section 301.6231(c)-5T, Temporary Proced. & Admin. Regs., 52

Fed. Reg. 6793 (Mar. 5, 1987),[20] was promulgated by the Secretary

---

[19](...continued)
1, Proced. & Admin. Regs., which is effective for all
designations, selections, and terminations of a TMP occurring on
or after Dec. 23, 1996.  See sec. 301.6231(a)(7)-1(s), Proced. &
Admin. Regs.

[20]  This temporary regulation concerning criminal tax
(continued...)

pursuant to section 6231(c)(2) and (3) and provides for the treatment of a partnership item of a partner who is the subject of a criminal tax investigation as follows:

> The treatment of items as partnership items with respect to a partner under criminal investigation for violation of internal revenue laws relating to income tax will interfere with the effective and efficient enforcement of the internal revenue laws. Accordingly, partnership items of such a partner arising in any partnership taxable year ending on or before the last day of the latest taxable year of the partner to which the criminal investigation relates shall be treated as nonpartnership items as of the date on which the partner is notified that he or she is the subject of a criminal investigation and receives written notification from the Service that his or her partnership items shall be treated as nonpartnership items. The partnership items of a partner who is notified that he or she is the subject of a criminal investigation shall not be treated as nonpartnership items under this section unless and until such partner receives written notification from the Service of such treatment.

In Phillips v. Commissioner, supra, this Court dealt with and rejected the arguments of a taxpayer-partner in several Hoyt cattle partnerships that the periods of limitations for the partnership taxable years in question had expired. The argument was based on the theory that agreements that Jay Hoyt (the TMP of each partnership) and the IRS executed extending the limitations periods did not bind the partners of the partnership. In Phillips v. Commissioner, supra, the taxpayer specifically argued

_____

[20](...continued)
investigations applies to partnership taxable years beginning after Sept. 3, 1982. See 52 Fed. Reg. 6779 (Mar. 5, 1987).

that:  (1) The second and third sentences of section 301.6231(c)-5T, Temporary Proced. & Admin. Regs., <u>supra</u>, were invalid, so that initiation of a criminal tax investigation of Jay Hoyt (the TMP of the partnership) automatically converted his partnership items into nonpartnership items as a matter of law, thereby effectuating Jay Hoyt's removal as TMP; (2) the criminal tax investigation of Jay Hoyt (the TMP) created a conflict of interest between Jay Hoyt's duties as a fiduciary of the partnership and his self-interest as the subject of a criminal tax investigation, and such conflict necessitated his removal as TMP based on the rationale of the Court of Appeals for the Second Circuit in <u>Transpac Drilling Venture 1982-12 v. Commissioner</u>, 147 F.3d 221 (2d Cir. 1998); and (3) the Commissioner abused his discretion by not issuing a written notice informing Jay Hoyt (the TMP) that his partnership items would be treated as nonpartnership items.

This Court, however, held that the extensions in <u>Phillips v. Commissioner</u>, <u>supra</u>, were valid and that the periods of limitations for those partnership taxable years thus had not expired.  In so holding, this Court concluded that:  (1) Section 301.6231(c)-5T, Temporary Proced. & Admin. Regs., <u>supra</u>, was a valid regulation; (2) the facts of <u>Phillips</u> were distinguishable from those of <u>Transpac</u>, since the criminal tax investigation of Jay Hoyt (a) did not create a disabling conflict of interest on

the part of Jay Hoyt (the TMP) toward the partners of the partnership, and (b) therefore, did not terminate his designation as TMP; and (3) the taxpayer failed to establish that respondent abused his discretion by not notifying Jay Hoyt (the TMP) that his partnership items would be treated as nonpartnership items. In Phillips v. Commissioner, 272 F.3d 1172 (9th Cir. 2001), affg. 114 T.C. 115 (2000), the Court of Appeals for the Ninth Circuit agreed with the Tax Court's reasoning and result in all pertinent respects.

C.   Determination as to Whether the Applicable Periods of Limitations on Assessment Have Expired

In the instant case, the Court's findings, supra p. 31, list the partnership taxable years in question, the date upon which the partnership return for each such year was filed, the respective dates upon which Jay Hoyt (the TMP of that partnership) and the IRS executed extension forms extending the limitation period for that year, the date to which Jay Hoyt and the IRS (in each extension) agreed to extend the limitation period, and the date upon which respondent issued the partnership the FPAA for that year.

As to each partnership taxable year in question, the parties essentially agree that the 3-year period of limitations generally provided under section 6229(a) would otherwise have expired prior

to the date upon which respondent issued each partnership the FPAA for that year, but for Jay Hoyt (the TMP) and the IRS's having executed timely an extension or a series of extensions that extended the period of limitations beyond the date upon which the FPAA was issued.

The parties disagree solely over whether the extensions that Jay Hoyt executed for the taxable years set forth supra p. 83, are valid and bind the partners of the partnership. Except for the extension concerning the 1984 taxable year of RCR #4, these extensions concern post-1986 partnership taxable years and were executed by Jay Hoyt and the IRS on various dates from February 1991 through March 1993. Jay Hoyt and the IRS executed the extension concerning RCR #4's 1984 taxable year on August 1, 1987.

The Court rejects petitioners' contention that section 301.6231(c)-5T, Temporary Proced. & Admin. Regs., supra, requires the IRS automatically to end the partnership treatment of the items of any TMP whenever a criminal tax investigation of that TMP is commenced. The Court of Appeals for the Ninth Circuit affirmed this Court's determination in Phillips v. Commissioner, 114 T.C. 115 (2000), that such an interpretation of the temporary regulation is improper, because it would require reading the first sentence of the temporary regulation in isolation, divorced from the other two sentences of the regulation as a whole.

Phillips v. Commissioner, 272 F.3d at 1175-1176. The Court of Appeals and this Court both concluded that the regulation, properly read as a whole, vests discretion in the IRS to terminate TMP status of an individual under criminal tax investigation. See Phillips v. Commissioner, 272 F.3d at 1176 and 114 T.C. at 129, 132-133.

Petitioners next argue that Jay Hoyt, in executing the extensions in question, was operating under purported disabling conflicts of interest, requiring this Court, pursuant to the rationale of the Court of Appeals for the Second Circuit in Transpac Drilling Venture 1982-12 v. Commissioner, 147 F.3d 221 (2d Cir. 1998), to invalidate these extensions and hold these extensions not binding upon the partners. Petitioners interpret Transpac as broadly requiring invalidation of a TMP's extension of the period of limitations if there is the mere potential for a conflict of interest on the part of the TMP in executing the extension. Additionally, petitioners suggest that a TMP also engaged in serious breaches of his other general partnership duties cannot execute an extension that binds the partners of the partnership, even where that TMP's execution of the extension itself with the IRS is not established to be in obvious breach or violation of his fiduciary duty as TMP to the partners.

In Transpac, Phillips v. Commissioner, 272 F.3d 1172 (9th Cir. 2001), and Madison Recycling Associates v. Commissioner, 295

F.3d 280 (2d Cir. 2002), affg. T.C. Memo. 2001-85, affg. T.C.
Memo. 1992-605, the alleged disabling conflict of interest that
purportedly existed during the execution of the extensions was
that each TMP was the subject of an ongoing criminal tax
investigation.  In Transpac, the Court of Appeals for the Second
Circuit found a disabling conflict existed on the part of the
TMPs in executing the extensions and invalidated those
extensions.  In contrast, in Phillips and Madison, both appellate
courts and this Court determined that the respective TMPs were
operating under no disabling conflict in executing the
extensions, and held the extensions valid and binding upon the
partners of the partnership.

In Phillips, neither the Court of Appeals for the Ninth
Circuit nor this Court viewed and interpreted the Transpac
holding as broadly as petitioners argue for in the instant case.
Further, both courts readily distinguished the facts in Phillips
from those in Transpac.  See Phillips v. Commissioner, 272 F.3d
at 1175 and 114 T.C. at 130-132.  As the Court of Appeals in
Phillips explained:

> Phillips puts particular reliance on Transpac Drilling
> Venture 1982-12 v. Commissioner, 147 F.3d 221 (2d Cir.
> 1998).
>
> Transpac sets out with admirable clarity that a
> TMP, although created by statute, owes a fiduciary duty
> to his partners, and that, as the TMP's acts bind his
> partners, they "secure their due process protection" by
> his faithful discharge of his fiduciary obligations.
> Id. at 225.  But in Transpac the court could observe,

"The facts of the matter speak for themselves." Id. at 227.  The IRS had sought waivers of the statute of limitations from the limited partners, who refused to execute them.  The IRS then went to the three TMPs who knew themselves to be under criminal investigation in connection with the partnership and were cooperating with the government in its case against another partner.  As the court observed, they had "a powerful incentive to ingratiate themselves to the government." Id.  They gave the waivers the IRS wanted.  The court properly found the waivers invalid.  Trust law, generally, invalidates the transaction of a trustee who is breaching his trust in a transaction in which the other party is aware of the breach.  See Restatement of Trusts, secs. 288-297.  Transpac is a salutary application of this rule to the particular case of a TMP who should have been seen by the IRS as laboring under an incapacitating conflict of interest.

Two circumstances differentiate this case.  The IRS made no attempt to get waivers from limited partners. The partnerships for which Hoyt was being investigated have not been shown to be the partnerships involved in this case.  It is not intuitively obvious that Hoyt did what is a routine accommodation--signing a waiver in order to avoid immediate assessment by the IRS--in order to ingratiate himself in the investigation of his partnerships.  Phillips has speculated that Hoyt so acted; he has not proved it.

Similarly, this Court in Phillips v. Commissioner, 114 T.C. at 131-132, in  distinguishing the facts in Phillips from those in Transpac, noted that there was no evidence that:  (1) The IRS approached the limited partners to execute extensions or that they refused to sign such extensions; (2) the promoter-TMP Jay Hoyt was, before or during the relevant period, indicted or convicted of a tax felony or cooperating with the Government; or (3) the IRS misled the partners about the existence of criminal tax investigations or ever instructed Jay Hoyt to say nothing

about such criminal tax investigations.  Further, the criminal tax investigations had ended prior to Jay Hoyt's execution of all except one or two of the extensions.

This Court in Phillips further noted that Jay Hoyt, in executing the extensions, did not try to curry favor or ingratiate himself with the IRS in relation to the criminal tax investigations.  He continued to promote the partnerships in his tax shelter program after the initiation of the criminal tax investigations, continued to defend his legal position throughout the criminal tax investigations, and continued to maintain that all partnership items were legitimate, a position consistent with that of his partners.

In Madison Recycling Associates v. Commissioner, 295 F.3d at 288-289, the Court of Appeals for the Second Circuit distinguished its earlier Transpac holding as based on the existence of an obvious and actual serious conflict of interest on the part of each of the Transpac TMPs in executing the extensions.  It noted that, unlike Transpac, there was no suggestion that the Madison TMP was a prospective governmental witness, nor was there any evidence the TMP had given the extensions in exchange for a grant of immunity or other inducements relevant to the criminal tax investigation, as neither the Madison TMP nor his representative apparently was

even aware of the existence of (or the prospect of) a criminal investigation.

In the instant case, Jay Hoyt executed virtually all of the extensions in question when no criminal tax investigation of him was being conducted. He executed extensions concerning the post-1986 partnership years on various dates from February 1991 through March 1993. Earlier, in the summer of 1989, CID commenced an investigation of Jay Hoyt for allegedly selling nonexistent cattle to the Hoyt cattle partnerships, but this investigation was completed by October 1, 1990. During this investigation of Jay Hoyt, CID in October 1989 was asked to review certain information and determine whether IRS special agents should join in an ongoing grand jury investigation of Jay Hoyt by the U.S. Attorney's Office in Sacramento. This grand jury investigation was closed on October 2, 1990. No prosecution resulted from either the CID investigation or the grand jury investigation.

Jay Hoyt executed the first of the extensions in question concerning post-1986 partnership taxable years in mid-February 1991, several months after the closing of the above CID and grand jury investigations in early October 1990. He executed the last of these extensions concerning post-1986 partnership years in early March 1993, over 5 months before CID's next criminal tax investigation of him commenced on or about August 31, 1993.

Accordingly, the argument that an ongoing criminal tax investigation created a disabling conflict for Jay Hoyt in executing these extensions is without merit, since no criminal investigations of Jay Hoyt were being conducted when these extensions were executed.

The extension concerning RCR #4's 1984 taxable year was executed by Jay Hoyt and the IRS on August 1, 1987, shortly before the U.S. Attorney's Office in Sacramento declined to prosecute him for his alleged backdating of documents. As this Court observed in Phillips v. Commissioner, 114 T.C. at 152, however, the Court of Appeals for the Second Circuit in Transpac did not assume that the mere existence of an investigation would subvert a TMP's judgment and bend him to the Government's will in dereliction of his fiduciary duties to his partners.

As in Phillips, there is no evidence in the instant case that Jay Hoyt executed the extensions under pressure in exchange for leniency in relation to any criminal tax investigation of him. In addition, Jay Hoyt continued to defend the legitimacy of the sheep partnerships as he did with the cattle partnerships in the Phillips case. With only minor exceptions, Jay Hoyt executed the extensions in the instant case during the same time period he executed the extensions in Phillips.

In the instant case, the Court concludes that petitioners have failed to establish that Jay Hoyt, in executing the

extension concerning the 1984 taxable year of RCR #4, was operating under a disabling conflict of interest due to this ongoing criminal investigation.

Although petitioners have alleged numerous breaches and violations by Jay Hoyt of other general partnership duties, his violations of those duties, if proven, have only a remote and highly attenuated connection, at best, to his execution as TMP of the extensions in dispute.  The Court is not convinced that such violations by Jay Hoyt of his other partnership duties in managing and operating a partnership, constitute disabling conflicts of interest in executing the extensions as TMP.  See Phillips v. Commissioner, 272 F.3d at 1175 (distinguishing Transpac, by noting, among other things, that a TMP's execution of an extension often is a routine accommodation granted the IRS and avoids respondent's issuance of an FPAA immediately).

Petitioners further suggest that Jay Hoyt granted the extensions in exchange for the IRS's abatement of penalties against him totaling $119,700, covering years prior to 1989.  Of the $119,700 of abated penalties, $90,000 were penalties under section 6701 assessed against Jay Hoyt sometime in mid-1989.  The IRS abated the $90,000 of section 6701 penalties in early 1991, following Jay Hoyt's filing a refund claim in 1990.  Petitioners state that the IRS "inexplicably" abated all $119,700 in penalties that it previously assessed against Jay Hoyt.

Petitioners suggest that the abatement was a quid pro quo for Jay Hoyt's executing the extensions. The Court rejects this as an unwarranted supposition on the part of petitioners.

In light of the issuance of the 1989 test case opinion in Bales v. Commissioner, T.C. Memo. 1989-568, we believe that the IRS, in all likelihood, chose to abate most of these penalties because of doubts about whether its imposition of the penalties ultimately would be sustained if Jay Hoyt were to bring a refund suit in U.S. District Court challenging the propriety of the penalties. As noted previously, this Court in Bales did not sustain respondent's disallowance of many of the tax benefits a number of partners in Hoyt cattle partnerships claimed for 1977, 1978, and 1979. This Court decided, among other things, that the Bales partnerships had acquired the benefits and burdens of ownership with respect to specific breeding cattle, that the purchase prices for the partnership cattle did not exceed the fair market value of those cattle, and that the promissory notes these partnerships issued were valid recourse indebtedness.

Also, in order to hold Jay Hoyt liable for certain return preparer penalties, the Government in such refund suit would have the burden of proof in establishing Jay Hoyt's liability for the penalty and would have to show, among other things, that Jay Hoyt had known that the deductions and credits claimed were incorrect and would result in an understatement of another's tax. See

secs. 6694(b), 6703(a), 6701(a)(3), 7427; <u>Bailey v. United States</u>, 927 F. Supp. 1274, 1278 (D.Ariz. 1996), affd. 117 F.3d 1424 (9th Cir. 1997).

D.   <u>Conclusion</u>

Based on the foregoing, petitioners have failed to establish that any of the extensions Jay Hoyt (the TMP) and the IRS executed are invalid.  Accordingly, the Court holds that the period of limitations with respect to each partnership taxable year in question did not expire prior to respondent's issuance of the FPAA.  See Rules 39, 142(a); <u>Madison Recycling Associates. v. Commissioner</u>, 295 F.3d 280, 286 (2d Cir. 2002); <u>Phillips v. Commissioner</u>, 272 F.3d 1172 (9th Cir. 2001); <u>Amesbury Apartments, Ltd. v. Commissioner</u>, 95 T.C. 227, 241-243 (1990).  In light of this holding, respondent's motion for partial summary judgment is moot.  See <u>supra</u> p. 84.

<u>Issue 3. Whether Some Partnerships' Purported Purchases of Breeding Sheep Constitute Either Valuation Overstatements for Purposes of Section 6621(c)(3)(A)(i) or Sham and Fraudulent Transactions for Purposes of Section 6621(c)(3)(A)(v)</u>

A.   <u>The Parties' Arguments</u>

1.   <u>Petitioners' Arguments</u>

In their amended petitions, petitioners ask this Court to determine that purported purchases of breeding sheep reported by some sheep partnerships are not tax-motivated transactions for purposes of section 6621(c).  Specifically, petitioners argue that these transactions of the partnerships constitute neither

valuation overstatements under section 6621(c)(3)(A)(i), nor sham or fraudulent transactions under section 6621(c)(3)(A)(v).

On July 16, 2001, during the trial in the instant case, respondent filed a motion to dismiss this section 6621(c) issue for lack of jurisdiction, together with a memorandum of points and authorities in docket No. 9550-94. The Court took the matter under advisement. On August 3, 2001, respondent filed identical motions, together with memoranda of points and authorities in docket Nos. 787-91, 4876-94, 9552-94, 9554-94, 13597-94, 13599-94, and 14038-96. The Court took these motions under advisement. Petitioners timely filed their objections to respondent's motions to dismiss. The parties then filed their respective posttrial briefs in the instant case, in which they have addressed the section 6621(c) issue and respondent's motions to dismiss.

Petitioners contend that this Court does have jurisdiction in these partnership level proceedings to determine whether or not the transactions involving the sheep partnerships are attributable to tax-motivated transactions for purposes of section 6621(c). Petitioners assert that these transactions are neither valuation overstatements as defined in section 6621(c)(3)(A)(i), nor are they sham or fraudulent transactions as defined in section 6621(c)(3)(A)(v). Among other things, petitioners maintain that if these transactions were shams, they were part of a fraud perpetrated by Jay Hoyt upon the partners

and that the partners did not knowingly participate in this fraud. Petitioners argue that it would be an absurd result to penalize and impose section 6621(c) interest against these victims of Jay Hoyt's fraud, who (petitioners allege) invested without the principal purpose of tax avoidance and genuinely believed that their partnership was engaged in a legitimate business activity.

Petitioners further argue that since they have conceded all of the depreciation deductions and investment credits that the Hoyt sheep partnerships claimed, the Court should find that there are no valuation overstatements because any statements of value or adjusted basis on the partnership returns concerning the partnership's purported breeding sheep are now irrelevant. In making this argument, petitioners are relying upon and seeking to come within the decisions by the U.S. Courts of Appeals for the Fifth and Ninth Circuits and this Court in Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), affg. 89 T.C. 912 (1987), Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990), affg. T.C. Memo. 1988-416, and McCrary v. Commissioner, 92 T.C. 827 (1989), respectively.

Todd, Gainer, and McCrary all held that the section 6659 addition to tax for valuation overstatement was inapplicable where the taxpayer conceded that no deductions or credits were allowable, due to property not having been placed in service.

Since none of the taxpayers in the three cited cases were entitled to any deductions and credits regardless of any valuation overstatement, there were no underpayments attributable to a valuation overstatement. McCrary further held that section 6621(c) interest was inapplicable where deductions are disallowed on separate and independent grounds that do not fall among the categories of tax-motivated transactions listed in section 6621(c)(3)(A).

Noting the U.S. Court of Appeals for the Fifth Circuit's decision in Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, petitioners additionally argue that there can be no valuation overstatement where the transaction was a sham and the asset alleged to have been acquired does not exist.

2.   Respondent's Arguments

Respondent contends that this Court, as set forth in respondent's motions to dismiss, lacks jurisdiction in these partnership proceedings to determine whether section 6621(c) applies.  However, respondent now further maintains that this Court does have jurisdiction to and should determine that (1) there were asset overvaluations and basis overstatements, and (2) the partnership transactions were shams.

Respondent disputes petitioner's argument that the partnership transactions do not involve valuation overstatements

for purposes of section 6621(c)(3)(A)(i).  According to respondent, the Todd, Gainer, and McCrary decisions (which petitioners rely upon) are distinguishable.  Respondent points out that the parties in the instant case, besides agreeing that the sheep partnerships are not entitled to almost all the tax benefits they originally claimed for the years at issue, have stipulated and agreed that (1) the partnerships failed to acquire the benefits and burdens of ownership of any sheep, (2) many of the purported breeding sheep a partnership allegedly purchased were fictitious, and (3) each partnership's stated purchase price for its "sheep" greatly exceeded the value of those "sheep".

Citing decisions of several appellate courts and this Court, respondent asserts that where a partnership fails to acquire ownership of any sheep for tax purposes, the partnership's correct adjusted basis for the sheep is zero, and a valuation overstatement under section 6621(c)(3)(A)(i) exists.  See Rose v. Commissioner, 868 F.2d 851, 854 (6th Cir. 1989), affg. 88 T.C. 386 (1987); Zirker v. Commissioner, 87 T.C. 970, 978-979, 981 (1986); see also Zfass v. Commissioner, 118 F.3d 184, 190-191 (4th Cir. 1997) (and cases cited threat), affg. T.C. Memo. 1996-167; cf. Singer v. Commissioner, T.C. Memo. 1997-325; Greene v. Commissioner, T.C. Memo. 1997-296.

Respondent additionally disagrees with petitioners' argument that the partnership transactions do not involve sham or

fraudulent transactions under section 6621(c)(3)(A)(v).

Respondent notes that transactions constituting either shams in

fact or shams in substance are shams for purposes of section

6621(c)(3)(A)(v).  Cherin v. Commissioner, 89 T.C. 986, 1000-1001

(1987); see Thomas v. United States, 166 F.3d 825, 834 (6th Cir.

1999) (holding that once a transaction is found to be a sham,

section 6621(c) interest is imposed regardless of a taxpayer's

investment motive); Anderson v. Commissioner, 62 F.3d 1266, 1274

(10th Cir. 1995) (same), affg. T.C. Memo. 1993-607.

B.    Section 6621(c)

Section 6621(c)[21] (formerly section 6621(d)) provides for an

increased rate of interest with respect to "any substantial

underpayment" of tax in any taxable year "attributable to 1 or

more tax motivated transactions" if the amount of the

underpayment for such year so attributable exceeds $1,000.

Section 6621(c)(3)(A) generally lists the types of transactions

which are considered "tax motivated transactions".  A tax

motivated transaction includes any valuation overstatement within

the meaning of section 6659(c), and such a valuation

overstatement exists, among other situations, if the adjusted

basis of property claimed on any return exceeds 150 percent of

_____

[21]    The Omnibus Budget Reconciliation Act of 1989 (OBRA 1989), sec. 7721(b), 103 Stat. 2106, 2399, repealed sec. 6621(c). This repeal was effective for returns the due date for which (determined without extensions) is after Dec. 31, 1989.  See OBRA 1989 sec. 7721(c), 103 Stat. 2400, Pub. L. 101-239.

the correct amount of basis.  Secs. 6621(c)(3)(A)(i), 6659(c).  A tax motivated transaction further includes "any sham or fraudulent transaction."  Sec. 6621(c)(3)(A)(v).

The section 6621(c) increased rate of interest does not apply to deductions disallowed on separate and independent grounds which do not fall within the specified categories of tax-motivated transactions.  McCrary v. Commissioner, 92 T.C. 827, 858-859 (1989).  However, an increased rate of interest will apply where a valuation overstatement or other category of tax-motivated transaction is an integral part of or is inseparable from the ground found for disallowance of an item.  Irom v. Commissioner, 866 F.2d 545, 547-548 (2d Cir. 1989), vacating in part T.C. Memo. 1988-211; McCrary v. Commissioner, supra at 859-860.

C.    The Tax Court's Jurisdiction

Congress enacted the partnership audit and litigation procedures to provide a method to uniformly adjust items of partnership income, loss, deduction, or credit that would affect each partner.  The statute makes a distinction between partnership items and nonpartnership items.  The tax treatment of partnership items may only be determined in a partnership level proceeding, while nonpartnership items may only be determined at the individual partner level.  See sec. 6221; Affiliated Equip.

Leasing II v. Commissioner, 97 T.C. 575, 576 (1991); Maxwell v.

Commissioner, 87 T.C. 783, 787-788 (1986).

Section 6226[22] authorizes the judicial review of FPAAs and

provides in pertinent part:

> SEC. 6226(f) SCOPE OF JUDICIAL REVIEW.-A court with
> which a petition is filed in accordance with this
> section shall have jurisdiction to determine all
> partnership items of the partnership for the
> partnership taxable year to which the notice of final
> partnership administrative adjustment relates and the
> proper allocation of such items among the partners.
> [Emphasis added.]

Section 6231(a) defines the term "partnership item" as

follows:

> (3) PARTNERSHIP ITEM.-The term "partnership item"
> means, with respect to a partnership, any item required
> to be taken into account for the partnership's taxable
> year under any provision of subtitle A to the extent
> regulations prescribed by the Secretary provide that,
> for purposes of this subtitle, such item is more
> appropriately determined at the partnership level than
> at the partner level.  [Emphasis added.]

As defined, partnership items can only be those items

arising under subtitle A of the Internal Revenue Code.  Section

---

[22]  The Taxpayer Relief Act of 1997 (Relief Act 1997), 111
Stat. 788, 1026, Pub. L. 105-34, sec. 1238(b)(1), amended sec.
6226(f) and expanded this Court's jurisdiction in partnership
level proceedings to include the applicability of "any penalty,
addition to tax, or additional amount" related to the adjustment
of a partnership item.  This amendment to sec. 6226(f) is
effective only for partnership taxable years ending after Aug. 5,
1997, and does not apply to the years at issue in the instant
case.  Relief Act 1997 sec. 1238(c), 111 Stat. 1027.  Moreover,
as noted supra note 21, sec. 6621(c) previously was repealed by
the OBRA 1989, effective for taxable years the due date of the
returns for which (determined without extensions) is after Dec.
31, 1989.

6621(c), however, is within subtitle F, not subtitle A. Affiliated Equip. Leasing II v. Commissioner, supra 577-578. In contrast to a partnership item, an "affected item" is "any item to the extent such item is affected by a partnership item." Sec. 6231(a)(5). Thus, section 6621(c) interest is an "affected item", because a taxpayer-partner's liability for such interest may require findings of fact peculiar to a particular partner. Affiliated Equip. Leasing II v. Commissioner, supra at 578; N.C.F. Energy Partners v. Commissioner, 89 T.C. 741, 744-746 (1987) (noting that section 6621(c)'s applicability also turns on the amount of a taxpayer's underpayment attributable to a tax-motivated transaction). Affected items of this type, because they depend on partnership level determinations, are by definition not partnership items and cannot be determined in a partnership level proceeding. Affiliated Equip. Leasing II v. Commissioner, supra at 578; N.C.F. Energy Partners v. Commissioner, supra at 743-745. Accordingly, the Tax Court lacks jurisdiction in this partnership level proceeding to decide the applicability of section 6621(c) interest.

To reflect our holdings with respect to Issues 1 through 3 and the concessions of the parties,

<u>Appropriate orders and decisions will be entered under Rule 155</u>.

APPENDIX

| Docket No. | Partnership and Tax Matters Partner |
|---|---|
| 787-91 | River City Ranches #1 Ltd., Leon Shepard, Tax Matters Partner<br>River City Ranches #2 Ltd., Leon Shepard, Tax Matters Partner<br>River City Ranches #3 Ltd., Leon Shepard, Tax Matters Partner<br>River City Ranches #4 Ltd., Leon Shepard, Tax Matters Partner<br>River City Ranches #5 Ltd., Leon Shepard, Tax Matters Partner<br>River City Ranches #6 Ltd., Leon Shepard, Tax Matters Partner |
| 4876-94 | River City Ranches #2, J.V., David Britton, Tax Matters Partner |
| 9550-94 | River City Ranches #3, J.V., Michael Dale, Tax Matters Partner |
| 9552-94 | River City Ranches #5, J.V., Stephen Hughes, Tax Matters Partner |
| 9554-94 | River City Ranches 1985-2, J.V.,* Jeffry Bergamyer, Tax Matters Partner |
| 13595-94 | River City Ranches #3, J.V., Michael Dale, Tax Matters Partner |
| 13597-94 | River City Ranches #5, J.V., Stephen Hughes, Tax Matters Partner |
| 13599-94 | River City Ranches 1985-2, J.V.,* Jeffry Bergamyer, Tax Matters Partner |
| 382-95 | Ovine Genetic Technology Syndicate 1987-1, J.V., Linda Routzahn, Tax Matters Partner |
| 383-95 | River City Ranches 1985-2, J.V.,* Jeffry Bergamyer, Tax Matters Partner |

385-95                  River City Ranches #3, J.V., Michael Dale,
                            Tax Matters Partner

386-95                  River City Ranches #5, J.V., Stephen Hughes,
                            Tax Matters Partner

14718-95                River City Ranches #1, J.V., Stephen Hughes,
                            Tax Matters Partner

14719-95                River City Ranches #2, J.V., David Britton,
                            Tax Matters Partner

14720-95                River City Ranches #3, J.V., Michael Dale,
                            Tax Matters Partner

14722-95                River City Ranches #5, J.V., Stephen Hughes,
                            Tax Matters Partner

14724-95                River City Ranches #7, J.V.,*
                            Jeffry Bergamyer, Tax Matters Partner

21461-95                Ovine Genetic Technology Syndicate
                            1987-1, J.V., Linda Routzahn,
                            Tax Matters Partner

5196-96                 Ovine Genetic Technology Syndicate
                            1987-1, J.V., Linda Routzahn,
                            Tax Matters Partner

5197-96                 Ovine Genetic Technology 1990, J.V.,
                            Leon Shepard, Tax Matters Partner

5198-96                 River City Ranches #1, J.V., Stephen Hughes,
                            Tax Matters Partner

5238-96                 River City Ranches #4, J.V., Leon Shepard,
                            Tax Matters Partner

5239-96                 River City Ranches #7, J.V.,*
                            Jeffry Bergamyer, Tax Matters Partner

5240-96                 River City Ranches #5, J.V., Stephen Hughes,
                            Tax Matters Partner

5241-96                 River City Ranches #6, J.V.,
                            Joseph Sotro, Sr., Tax Matters Partner

9779-96          River City Ranches #4, J.V., Leon Shepard,
                     Tax Matters Partner

9780-96          River City Ranches #5, J.V., Stephen Hughes,
                     Tax Matters Partner

9781-96          River City Ranches #6, J.V.,
                     Joseph Sotro, Sr., Tax Matters Partner

14038-96         River City Ranches #4, J.V., Leon Shepard,
                     Tax Matters Partner

21774-96         Ovine Genetic Technology 1990, J.V.,
                     Leon Shepard, Tax Matters Partner

3304-97          River City Ranches #3, J.V., Michael Dale,
                     Tax Matters Partner

3305-97          River City Ranches #2, J.V., David Britton,
                     Tax Matters Partner

3306-97          River City Ranches #1, J.V., Stephen Hughes,
                     Tax Matters Partner

3311-97          Ovine Genetic Technology Syndicate
                     1987-1, J.V., Linda Routzahn,
                     Tax Matters Partner

3749-97          River City Ranches #7, J.V.,*
                     Jeffry Bergamyer, Tax Matters Partner

15747-98         Ovine Genetic Technology Syndicate
                     1987-1, J.V., Linda Routzahn,
                     Tax Matters Partner

15748-98         River City Ranches #1, J.V., Stephen Hughes,
                     Tax Matters Partner

15749-98         River City Ranches #3, J.V., Michael Dale,
                     Tax Matters Partner

15750-98         River City Ranches #2, J.V., David Britton,
                     Tax Matters Partner

15751-98         River City Ranches #4, J.V., Leon Shepard,
                     Tax Matters Partner

15752-98          River City Ranches #5, J.V., Stephen Hughes,
                      Tax Matters Partner

15753-98          River City Ranches #6, J.V.,
                      Joseph Sotro, Sr., Tax Matters Partner

15754-98          River City Ranches #7, J.V.,*
                      Jeffry Bergamyer, Tax Matters Partner

19106-98          Ovine Genetic Technology 1990, J.V.,
                      Leon Shepard, Tax Matters Partner

13250-99          Ovine Genetic Technology Syndicate
                          1987-1, J.V., Linda Routzahn,
                      Tax Matters Partner

13251-99          Ovine Genetic Technology 1990, J.V.,
                      Leon Shepard. Tax Matters Partner

13256-99          River City Ranches #1, J.V., Stephen Hughes,
                      Tax Matters Partner

13257-99          River City Ranches #2, J.V., David Britton,
                      Tax Matters Partner

13258-99          River City Ranches #3, J.V., Michael Dale,
                      Tax Matters Partner

13259-99          River City Ranches #4, J.V., Leon Shepard,
                      Tax Matters Partner

13260-99          River City Ranches #5, J.V., Stephen Hughes,
                      Tax Matters Partner

13261-99          River City Ranches #6, J.V.,
                      Joseph Sotro, Sr., Tax Matters Partner

13262-99          River City Ranches #7, J.V.,*
                      Jeffry Bergamyer, Tax Matters Partner

16557-99          River City Ranches #1, J.V., Stephen Hughes,
                      Tax Matters Partner

16563-99          Ovine Genetic Technology Syndicate
                      1987-1, J.V., Linda Routzahn,
                      Tax Matters Partner

16568-99     River City Ranches #5, J.V., Stephen Hughes,
         Tax Matters Partner

16570-99     River City Ranches #3, J.V., Michael Dale,
         Tax Matters Partner

16572-99     River City Ranches #4, J.V., Leon Shepard,
         Tax Matters Partner

16574-99     River City Ranches #2, J.V., David Britton,
         Tax Matters Partner

16578-99     River City Ranches #7, J.V.,*
         Jeffry Bergamyer, Tax Matters Partner

16581-99     River City Ranches #6, J.V.,
         Joseph Sotro, Sr., Tax Matters Partner

17125-99     Ovine Genetic Technology 1990, J.V.,
         Leon Shepard, Tax Matters Partner

_____

*--River City Ranches 1985-2, J.V., was formed and began operating in 1987.  In 1991, the partnership became known as River City Ranches #7, J.V.